705 P.2d 1365

**The STATE of Arizona, Appellee,**

v.

**Allen Dale REIDHEAD, Appellant.**

**No. 2 CA–CR 3348.**

Court of Appeals of Arizona, Division 2.

April 10, 1985.

Review Denied Aug. 27, 1985.

Robert K. Corbin, Atty. Gen. by William J. Schafer, III, and Linda A. Akers, Phoenix, for appellee.

Frederic J. Dardis, Pima County Public Defender by Regula Case, Tucson, for appellant.

## OPINION

HOWARD, Judge.

Appellant was convicted by a jury of a single count of child abuse, a non-dangerous, non-repetitive class 4 felony, and was placed on probation for a period of four years. On March 31, 1983, appellant brought his four-year-old son Allen Jr., to the Northwest Medical Center, Urgent Care Center in Tucson for the treatment of a broken arm. The boy was examined by Dr. Margaret Buford, who also observed what appeared to be a slap mark on the child's face and a mark on his chest. Appellant told Dr. Buford that he had slapped his child and that the child had then fallen off the porch. Dr. Buford testified that she did not believe any of the injuries that she observed were consistent with a fall from a porch. Dr. Buford referred the child to Dr. Jeryl Dansky of the University Hospital for treatment and consultation. He also examined the child. Dr. Dansky testified that the injuries were not consistent with a fall from the porch. Over appellant's objection, Dr. Dansky was allowed to testify that the child told her, "Daddy twisted my arm."

The child and his mother were not available for trial. There was no showing as to what efforts were made to locate them. The only testimony came from the doctors and a detective who had interviewed appellant.

Appellant contends the trial court erred in allowing Dr. Dansky to testify as to the fact that the child stated that his father twisted his arm. The state contends that the statement was admissible as an exception to the hearsay rule under Rule 803(4), Arizona Rules of Evidence, which provides an exception for:

"Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment."

We do not agree. The rule was discussed in the case of *State v. Jeffers*, 135 Ariz. 404, 661 P.2d 1105 (1983) where the court stated:

"Two important factors derive from the rule's rationale: (1) whether the declarant's motive is consistent with receiving medical care; and (2) whether it is reasonable for the physician to rely on the information in diagnosis or treatment. *United States v. Iron Shell*, 633 F.2d 77 (8th Cir.1980). Thus in *Iron Shell*, the court admitted an assault victim's statements to her doctor stating: 'It is important to note that the statements concern what happened rather than who assaulted her. The former in

most cases is pertinent to diagnosis and treatment while the latter would seldom, if ever, be sufficiently related.' *Id.* at 84. *Accord, United States v. Nick,* 604 F.2d 1199 (9th Cir.1979). The Advisory Committee's Note to rule 803(4) also makes a point of illustrating that statements as to fault would not ordinarily qualify under the exception." 135 Ariz. at 420–21, 661 P.2d at 1121–22.

Here, the statement as to fault was not reasonably pertinent to diagnosis or treatment. The court erred when it allowed the testimony into evidence. The error was not harmless here because that statement from the child was the only statement directly connecting appellant to the injury to the boy's arm, his most serious injury. We note with astonishment the dissent's contention that appellant's right to confrontation is not violated because a child's statement to a doctor in a child abuse situation is inherently trustworthy. Support for this statement consists of two articles contained in professional magazines by authors whose expertise is unknown. *Dutton v. Evans,* 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970), teaches that the out-of-court statements of a person not called as a witness and never previously made available for cross-examination are admissible at least when three conditions are satisfied: (1) there are 'indicia of reliability' surrounding the evidence; (2) the evidence is 'peripheral' rather than 'crucial' or 'devastating', and (3) the witness is equally available to the prosecution and the defense. 400 U.S. 74 at 88, 89 & n. 19, 91 S.Ct. at 219, 220 & n. 19. Even if we were to agree that condition (1) existed here, the other two clearly did not. Furthermore, the record does not disclose that a good faith effort was made to locate the mother and child. See *United States v. Yates,* 524 F.2d 1282 at 1286 n. 10 (D.C.Cir.1975). Apparently the dissent believes that we can dispense with the cross-examination of child witnesses. The constitutional right to confrontation should not be eliminated on the basis of some magazine articles.

In *State v. Martin,* 139 Ariz. 466, 679 P.2d 489 (1984), the court states that an important factor which should be considered when deciding whether the right to confrontation has been satisfied is the importance of the evidence. Here, the hearsay was the major evidence. Its admission was devastating to the defendant. The right to confrontation is at the heart and soul of our criminal judicial system and must be jealously guarded. We note that the Wyoming court in the case relied upon by the dissent, a 3–2 decision, did not even address the confrontation problem. The dissent would allow the state in child abuse cases to avoid any cross-examination by the simple expedient of not having the child available and not having him testify. Contrary to the dissent's major premise, the identification of the person who twisted the child's arm is not necessary for the doctor to make his medical determination as to the nature of the injury.

Appellant has raised other issues which we need not discuss in view of our disposition.

Reversed.

BIRDSALL, P.J., concurs.

HATHAWAY, Judge, dissenting.

The majority relies on *State v. Jeffers,* 135 Ariz. 404, 661 P.2d 1105 (1983), in concluding that the child's out-of-court statement to the treating physician, as relayed by that physician in court, was "not reasonably pertinent to diagnosis or treatment" [majority opinion at 3] and thus inadmissible under Rule 803(4), Rules of Evidence, 17A A.R.S. I believe this conclusion to be in error for several reasons:

(1) It misapplies the analysis of *Jeffers.*

(2) It fails to recognize that, in contrast with virtually any other medical condition discussed by a patient with his doctor, child abuse is *defined* in terms of a class of perpetrator.

(3) It ignores the proven reliability of child identifications of the abuser, which would qualify the limited class of statements at issue here for admission under the "catch-all" hearsay exceptions, 803(24) and 804(5).

(4) It flies in the face of the intent of the legislature to deal aggressively with offenses against children as evidenced by carving out as a special offense, injury of a child by a caretaker in A.R.S. § 13–3623, "Child abuse," and by imposing upon medical and other personnel having occasion to know of abusive injury a duty to report all non-accidental injuries. A.R.S. § 13–3620.

Preliminarily, I would note that the role of this court must be one of restraint with respect to the trial court. "We are only to reverse where we find that the admission of this testimony constituted an abuse of discretion." *United States v. Iron Shell*, 633 F.2d 77, 86 (8th Cir.1980).

### THE JEFFERS ANALYSIS

*State v. Jeffers*, supra, quoted in pertinent part by the majority, breaks down the rationale of the medical diagnosis and treatment exception into two parts: whether the declarant's motive is consistent with receiving medical care and whether the physician reasonably relies on the information in diagnosis or treatment. 135 Ariz. at 420–1, 661 P.2d at 1121–22. With respect to declarant's motive, while it is conceivable that the victim in this case had developed a motive to lie, once his mother intervened and transported him to the second doctor where the questioned statement was made, there is nothing in the record to suggest any motive to lie had developed. On the contrary, the detail of the child's statement to Dr. Dansky, that his father had twisted his arm when he got into the father's record collection, is consistent with what was admitted by the defendant[1] about the circumstances of injury and with the findings of two physicians. In any case, the first prong of *Jeffers* requires only that the patient have a motive consistent with receiving medical care, surely the

case here, not that no other motive is operating.

The child's statement, elicited in response to an open-ended question from the consulting pediatrician in an examining room, suggests no motive other than a desire to cooperate and get well.

"Q. Now, what did you do after the child came to your attention there at the hospital?

A. I spoke with the mother and the child, and examined the child.

Q. Okay. And you spoke with the child first?

A. Yes.

Q. And then the mother?

A. That's correct.

Q. And then in what kind of setting did you speak with the child?

A. In one of our examining rooms in the pediatric clinic.

Q. And can you tell us about your conversation with the child?

A. I initially approached the child and asked what had happened, and after initially not saying anything, the child told me that he had been playing with one of his father's record[s].

MR. HANTMAN: Excuse me. I'll object as not being part of the basis for the treatment, Your Honor.

THE COURT: Objection is overruled. She may answer.

Q. (By Ms. Jorgenson) You may answer.

A. *The child was playing with one of the father's records and got it dirty, and his father twisted his arm.* (Emphasis added)

Q. Now, did you speak with the child first or the mother first regarding what happened?

A. I spoke with the child first.

THE WITNESS: He said he had slapped the child across the right side of the face, and then the child fell off the porch striking his left and his—on the ground, and right anterior chest against the porch.
Q. (By Ms. Jorgenson) Okay. Did he tell you how recently this had occurred?
A. It had occurred within the hour before he had come in."

---

1. The admission of appellant's statement concerning what had happened to the child to Dr. Buford, the first physician to see the child, although objected to at trial, was not argued as error on appeal.

    "Q. And what did Mr. Reidhead tell you about what had happened?
    *    *    *    *    *    *

Q. And then you had a conversation with the mother?

A. That's correct.

Q. And then did you actually examine the child?

A. Yes.

Q. Can you tell the jury what you observed?

A. He appeared frightened, and was crying, as I mentioned before.

He seemed to be well nourished. Normal size for a five year old.

His exam was significant for bruises on both temporal areas on his face, a bruise on his upper chest on the right side, and some swelling of the upper part of his left arm."

The second prong of the *Jeffers* analysis, reasonable reliance by the physician, is also satisfied. The child's statement contributed to making the diagnosis of a twist fracture of the upper left arm as well as the additional diagnosis of child abuse. Indeed, the child's statement was critical to implementation of treatment for child abuse, particularly protection of the child from further abuse. The need to identify the injury as caretaker-inflicted for purposes of treatment is well-recognized in the medical literature[2] on abuse. "[T]he main goal is to identify abuse and protect the child pending further investigations of the situation and institution of therapy." Britton,[3] *Medical and Legal Aspects of Child Abuse and Neglect in Arizona*, Arizona Medicine, XLI:5, 320 (1984).

Child abuse (also termed "battered child syndrome" and "non-accidental injury") is defined in terms of the individual *who* inflicts injury: "[t]he diagnostic term 'battered baby' was coined by Kempe in the United States in 1962 to describe the child with injuries deliberately inflicted by parents (or guardians)." Carne,[4] *Non-Acci-*

*dental Injury*, The Practitioner, Vol. 228 at 415, April 1984. It can only be considered reasonable for Dr. Dansky to have relied on the child's statement, when the twist fracture suffered by Allen Reidhead, Jr., has been termed an abnormality "pathognomonic for child abuse." Britton, supra, at 319. Thus, child abuse injury, as opposed to the adult drug overdose problem presented in *Jeffers*, would meet the two-part rationale for admitting a hearsay statement which identifies the perpetrator of the injury in the medical treatment setting.

Other jurisdictions have very recently begun to recognize that child abuse, including sexual abuse, presents a special kind of medical problem which makes statements appearing to go to "fault" admissible. *United States v. Iron Shell*, supra; *Goldade v. State*, 674 P.2d 721 (Wyo.1984); *State v. Garza*, 337 N.W.2d 823 (S.D.1983). The South Dakota Supreme Court in *Garza*, held that statements of young rape victims to a physician, including identification of the assailant as their step-father, utilized by the physician in his physical examination, were admissible under Rule 803(4). And in a case with facts almost identical to the instant case, with the exception that the abuse was limited to multiple bruising by the mother with no skeletal injury, the Supreme Court of Wyoming held that statements which identify the abuser, made by a child to medical personnel, are admissible in evidence under the exception to the hearsay rule articulated in Rule 803(4). *Goldade v. State*, supra.

"In an instance such as this the court is confronted with a unique and special problem, and we must be concerned with an additional responsibility which is imposed upon a physician. Child abuse is

---

**2.** The medical journals which I have found helpful in interpreting the legal problem of child abuse are part of the University of Arizona Health Sciences Center Library collection, all authored by medical or social scientists primarily for other scientists, and are not "magazine articles" of the type to be found in *Parade Magazine* or *Popular Mechanics*.

**3.** Helen Britton, M.D., Assistant Professor, Department of Pediatrics, University of Arizona Health Sciences Center, Tucson, Arizona 85724.

**4.** Stuart Carne, OBE, MB, FRCGP, DCH, Senior Tutor in General Practice, Royal Postgraduate Medical School, Hammersmith Hospital, London, England.

recognized as encompassing more than mere physical injury.

\*  \*  \*  \*  \*  \*

The policy of this state as it is found incorporated in the child protection statutes, makes vital the determination by physicians and others who are treating suspected child abuse cases of whether the injuries were inflicted deliberately. They also must decide whether the child may be in imminent danger, which determination is necessary in determining the propriety of temporary protective custody. *In the absence of information as to the identity of any assailant of the child this latter decision cannot be made in a rational way.*" (Emphasis added) 674 P.2d at 725–726.

I believe the rationale for admission of the Reidhead child's statement identifying the abuser to a physician is consistent with the rationales of *Garza, Goldade* and *Jeffers.*

## CHILD ABUSE AS A MEDICAL DIAGNOSIS WITH A PRESCRIBED TREATMENT

The rules of evidence developed under the federal rules and adopted in Arizona contemplate an organic scheme, where "room is left for growth....," as long as the overriding purposes of the rules are served. See M. Udall and J. Livermore, Arizona Practice: Law of Evidence, 2nd ed. at 305–306 (1982). Consistent with this view, I believe the time has come for Arizona to recognize child abuse (or non-accidental injury as it is also called) as an unfortunately commonplace medical phenomenon. (It is estimated that the incidence of child abuse is from one to six percent of all children, with 7,597 reported cases of child abuse and neglect in Arizona in 1980.) Britton, supra. As discussed above, the diagnosis of child abuse is peculiar among medical disorders, in that it is defined in terms of *who* inflicted the bruising, fracture or burns; it is a "phenomenon of parental child maltreatment." Smith,[5] *Non-Accidental Injury to Children-I, A Review of Behavioral Interventions,* Behavioral Research Therapy, Vol. 22, No. 4 at 331 (1984). Essential to making the diagnosis and prescribing the proper treatment plan is "recognition of a concerning history as well as the ability to identify physical and emotional signs of the problem." *Britton,* supra, at 318. Clearly, Dr. Dansky was following good medical practice when she inquired of the Reidhead boy how he had gotten hurt. His statement that his father had twisted his arm was an important piece of information in focusing the doctor's exam, in helping her to decide what tests to order (e.g. a blood work-up[6] to rule out an abnormal body susceptibility to injury and bruising), and in making the proper contacts to insure successful treatment in the future (e.g. other specialists, the hospital social worker, and police). Not only physicians, but this court, as the Supreme Court of Wyoming recognized, are "confronted with a unique and special problem...." *Goldade v. State,* supra at 725. See also, *United States v. Iron Shell,* supra, at 84, where the Eighth Circuit found persuasive the doctor's explanation of the relevancy of questions going to the circumstances of the sexual assault upon the patient, for which she was seeking treatment:

"He testified that a discussion of the cause of the injury was important to provide guidelines for his examination by pinpointing areas of the body to be examined more closely and by narrowing his examination by eliminating other areas. It is not dispositive that Dr. Hopkins' examination would have been identical to the one he performed if Lucy had been unable to utter a word. The doctor testified that his examination would have been more lengthy had he been unable to

---

5. Jane E. Smith, Department of Psychology, Institute of Psychiatry, De Crespigny Park, Denmark Hill, London SE5 8AF, England.

6. "Occasionally bleeding disorders are mistaken for non-accidental trauma." Britton, supra at 319. It is for this reason that the diagnostic literature on child abuse recommends a blood workup. Dr. Buford was apparently following good medical procedure for suspected child abuse when she referred the Reidhead child to University Hospital and Dr. Dansky, in particular, for "an appropriate blood workup to rule that ['bruising problems because of his bone makeup'] out."

elicit a description of the general cause, although he stated the exam would have been basically the same. The fact that in this case the discussion of the cause of the injury did not lead to a fundamentally different exam does not mean that the discussion was not pertinent to diagnosis. It is enough that the information eliminated potential physical problems from the doctor's examination in order to meet the test of 803(4). Discovering what is not injured is equally as pertinent to treatment and diagnosis as finding what is injured. Dr. Hopkins also testified, in response to specific questions from the court that most doctors would · have sought such a history and that he relied upon Lucy's statements in deciding upon a course of treatment.

In light of this analysis we hold that it was not an abuse of discretion to admit the doctor's testimony."

## CHILD IDENTIFICATIONS AS RELIABLE

The hearsay rule has developed to guard against four dangers: misperception, misremembering, insincerity and ambiguity. M. Udall and J. Livermore, supra at 234–235. When these dangers are minimal, because of the circumstances of the out-of-court statement, the hearsay statement is likely to fall under some exception and be admissible. The statement made by a boy, two weeks short of his fifth birthday, a few hours after his arm was broken, seems unlikely to present a problem of misperception, misremembering or ambiguity. In virtually all child abuse cases, the real danger perceived by the courts is insincerity, more specifically the likelihood of lying. A child victim who testifies in court must demonstrate that he or she understands the necessity of telling the truth. *State v. Bowie*, 119 Ariz. 336, 580 P.2d 1190 (1978).

This can be done by oath or by examination of the child by the judge. Id. Once we remove the child from court and hear his testimony through .the mouth of another, some other means must be used to address the question of veracity.

Research into the question of the truthfulness of accusations of sexual abuse demonstrates that false accusations are rare. Indeed, the incidence of false retraction of valid accusations of incest may be greater than the incidence of false accusation. Goodwin,[7] *Incest Hoax: False Accusations, False Denials*, Bulletin of the American Academy of Psychiatry and the Law, Vol. VI, No. 3, 269 (1978). The Goodwin et al. study of 46 victims of family sexual abuse revealed only one case of false accusation by a child. A canvass of six other agencies in the Albuquerque area revealed two additional cases of false accusation of incest, typified by the complaint of a 13-year-old who had become jealous, disobedient, and depressed after her mother's remarriage. A study by Faller,[8] *Is The Child Victim of Sexual Abuse Telling the Truth?*, Child Abuse & Neglect, The International Journal at 475 (1984), concluded that "children do not make up stories asserting they have been sexually molested. It is not in their interests to do so. Young children do not have the sexual knowledge necessary to fabricate an allegation." While fabrication of physical injury may require less sophistication, the hallmark of fact versus fiction would seem to be the same: details about the abuse and surrounding events. See *Faller*, supra, at 476. Dr. Dansky's report that the victim stated he "was playing with one of the father's records and got it dirty, and his father twisted his arm," contains the kind of factual content found to be characteris-

**7.** Jean Goodwin, M.D., M.P.H., consulting psychiatrist at the Family Resource Center and Assistant Professor, Department of Psychiatry, University of New Mexico School of Medicine, Albuquerque, N.M. 87131, Doris Sahd, Ph.D., Assistant Professor, Department of Psychiatry, University of New Mexico School of Medicine, and Richard T. Rada, M.D., Associate Professor and Vice Chairman, Department of Psychiatry, University of New Mexico School of Medicine, Secretary of the American Academy of Psychiatry and the law.

**8.** Kathleen Coulborn Faller, M.S.W., Ph.D., Assistant Professor, School of Social Work, Co-director, University of Michigan Inter-disciplinary Project on Child Abuse and Neglect, 1015 East Huron, Ann Arbor, MI 48109.

tic of the truthful accusation in the sexual abuse cases.

The reliability of child victim statements to medical personnel is sufficiently great that they may qualify under the "catch-all" hearsay exceptions, particularly the catch-all for the unavailable witness, as in this case, 804(5). The hearsay statement objected to meets all three provisos: (1) offered as evidence of a material fact (who injured the victim and how), (2) more probative than any other evidence procurable through reasonable efforts (the boy had "apparently disappeared") and (3) the general purposes of these rules and the interests of justice will best be served by admission (public policy strongly favors the special protection of vulnerable children). Even the dissent in *Goldade v. State,* supra, at 731, Rose, J. dissenting, believed that the catch-all exception is sufficient to allow into evidence trustworthy, out-of-court statements, which impliedly may be of this type.

The reliability of hearsay statements is directly related to the question of whether they are confrontation clause violative. Because I believe statements made by young children to medical personnel in situations involving suspected abuse are inherently trustworthy, I do not find a serious confrontation problem in general and certainly not on the facts of this case. Reliability is the key to confrontation analysis, as stated in *State v. Martin,* 139 Ariz. 466, 478, 679 P.2d 489, 501 (1984):

> "The exception to the confrontation clause does not turn upon the nature of the extrajudicial statement as hearsay or non-hearsay or whether it falls within or without an hearsay exception; certainly, the rules of evidence may be revised from time to time without necessarily violating the confrontation clause. The exception to the confrontation clause is based, rather, upon the view that recognized hearsay exceptions have sufficient 'indicia of reliability' so that their use does not offend the clause even though the witness is not produced for confrontation."

A fact sufficient for a physician to rely on for diagnosis and treatment is trustworthy enough to escape hearsay proscription. J. Weinstein & M. Berger, Weinstein's Evidence, 803–146 (1984). "This principle recognizes that life and death decisions are made by physicians in reliance on such facts and as such should have sufficient trustworthiness to be admissible...." *United States v. Iron Shell,* supra, at 84. In addition, our supreme court, in a case decided only two weeks after *Martin,* recognizes "the necessity of a liberal interpretation of the rules in cases involving child molesting and would, no doubt, reach a similar result in cases involving child abuse and similar crimes." *State v. Rivera,* 139 Ariz. 409, 413 n. 1, 678 P.2d 1373, 1377 n. 1 (1984).

The victim's statement was not the sine qua non for returning a verdict of child abuse against appellant in light of the fact that the appellant admitted to the emergency room physician that he had slapped the child, whereupon the child had fallen off a porch. The bruising from the confessed slap was confirmed in photographs admitted into evidence. Both treating physicians stated that the slap marks on the temples were inconsistent with a fall. (Child abuse is defined by statute to include bruising. A.R.S. § 13–3623.) In addition, the defense does not deny that appellant brought the child to the emergency room with a broken arm, which Dr. Buford stated was of a type inconsistent with a fall off a porch. Thus ample direct evidence with respect to bruising and circumstantial evidence with respect to the twist fracture existed to support a jury verdict of child abuse.

## ARIZONA PUBLIC POLICY

The legislature, recognizing this defenseless segment of our population, has singled out child abuse victims for special protection by making physicians, among others, specially accountable for their protection against harm from those supposedly responsible for their care. See A.R.S. § 13–3623 and § 13–3620. Indeed a physician is subject to a class 2 misdemeanor for failing to report immediately suspected child abuse. A.R.S. § 13–3620(F). *Compare*

*with, Goldade v. State,* supra, at 726 ("The policy of this state as it is found incorporated in the child protection statutes, makes vital the determination by physicians and others who are treating suspected child abuse cases of whether the injuries were inflicted deliberately.") The admission of the child victim's statements under the circumstances of this case requires no new hearsay exception. Rather, it demands an *au courant* construction of an adopted rule, Rule 803(4), Rules of Evidence, 17A A.R.S. I, therefore, respectfully dissent.