722 P.2d 304

**The STATE of Arizona, Appellee,**

v.

**Frank William POEHNELT and Barbara Cribbs Howell Poehnelt, Appellants.**

**No. 2 CA–CR 2860.**

Court of Appeals of Arizona, Division 2, Department B.

June 7, 1985.

Robert K. Corbin, Atty. Gen. by Bruce M. Ferg, Tucson, for appellee.

Frederick S. Klein, Davis, Siegel & Gugino by Carla G. Ryan and Michael L. Piccarreta, Tucson, for appellant Barbara Poehnelt.

Larry S. Rosenthal, Tucson, for appellant Frank Poehnelt.

HATHAWAY, Presiding Judge.

Appellants were jointly tried to a jury and convicted of intentional or knowing child abuse under A.R.S. § 13–3623(B)(1) (under circumstances likely to produce death or serious physical injury). At sentencing, the court found neither aggravating nor mitigating circumstances and sentenced both to 10.5 years' imprisonment, the presumptive term for a class 2 felony enhanced because of the dangerous nature. Appellants bring consolidated appeals. Frank Poehnelt, whose appeal we consider first, raises three issues for our consideration. Barbara raises 20 issues. We affirm as to both.

On October 23, 1981, about 10:30 at night, Pima County Sheriff's deputies responded to a report of screams coming from a room of a motel located on Benson Highway in Tucson. They entered the dark room, which had a blanket draped over the window, and found Barbara Michelle Howell (Michelle), age 9, alone, "hogtied" (hands and feet bound behind her),

and gagged with socks. Michelle had bruises on her face, a chipped front tooth and was severely underweight and short for her age. She was placed with Child Protective Services. About 3:40 a.m. on the morning of October 24, her stepfather, an ex-police officer, arrived at the motel and was arrested. Her mother, Barbara Poehnelt, arrived later and was taken in for questioning. Three days later, she too was arrested.

Both Frank and Barbara were charged with child abuse and kidnapping. Barbara's attorney and the prosecution moved for a severance of the trials of the two defendants. The prosecution motion for severance was granted. The prosecution subsequently moved for joinder of the trials and that motion was granted over Barbara's objection. After the trial was underway and evidence had been received which was inadmissible for purposes of child abuse, but admissible to show intent with regard to the kidnapping charge, the court granted the motion to sever the charges and the trial proceeded with respect to the child abuse charges only.

It was established at trial that Frank, Barbara and Michelle had arrived by automobile from Los Angeles and had been in Tucson for about two weeks. Frank had bound and gagged Michelle on October 23 and had left her in the motel room. She had been severely deprived of food for a period of years to such an extent that she was emaciated, her growth was stunted, she had a protuberant abdomen and she had sustained severe mental and emotional injuries. Frank had struck her with his fists, on the head with pliers and on the fingers with a hammer, breaking two of them. Frank took the witness stand at trial; Barbara did not.

## APPEAL OF FRANK POEHNELT

### I.

Was Frank Poehnelt denied effective assistance of counsel due to his attorney's failure to investigate and present a defense based on insanity? Frank was ex-amined shortly before the beginning of trial by a psychiatrist, Dr. John LaWall, who concluded that he could find no mental disorders and that the defendant could assist in his defense. Ineffective assistance of counsel cannot be premised upon any tactical choice, especially where no prejudice is shown. *State v. Thomas*, 133 Ariz. 533, 652 P.2d 1380 (1982). The decision not to present an insanity defense in the face of the psychiatric information that was available is an option appropriately left to counsel in the selection of trial tactics. *State v. Ring*, 131 Ariz. 374, 641 P.2d 862 (1982). Counsel's performance will be judged on the basis of prevailing professional norms. *State v. Nash*, 143 Ariz. 392, 694 P.2d 222 (1985). An attorney who declines an insanity defense in light of the medical opinion given here can only be viewed as having acted reasonably.

### II.

Was the evidence sufficient to support Frank's conviction of "intentional or knowing" child abuse? Appellants were found guilty under A.R.S. § 13–3623(B)(1) of intentionally or knowingly abusing a child under circumstances likely to produce death or serious physical injury. The statute reads:

"B. Under circumstances likely to produce death or serious physical injury, any person who causes a child to suffer physical injury or, having the care or custody of such child, causes or permits the person or health of such child to be injured or causes or permits such child to be placed in a situation where its person or health is endangered is guilty of an offense as follows:

1. If done intentionally or knowingly, the offense is a class 2 felony.

2. If done recklessly, the offense is a class 3 felony.

3. If done with criminal negligence, the offense is a class 4 felony."

It is argued that the only direct evidence of Frank Poehnelt's intent comes from his own testimony, which was a denial that he intended to harm Michelle or that

he knew he was harming her. It is then argued that if Frank's mental state was more culpable than recklessness or negligence, it had to be proved by circumstantial evidence inconsistent with finding a lesser culpable state. That position has been rejected in Arizona since *State v. Harvill*, 106 Ariz. 386, 476 P.2d 841 (1970). The standard on review is whether there exists substantial evidence from which a rational trier of fact could have found guilt beyond a reasonable doubt, *State v. Clow*, 130 Ariz. 125, 634 P.2d 576 (1981), and reasonable inferences will be resolved against the defendant in favor of upholding the verdict. *State v. Tison*, 129 Ariz. 546, 633 P.2d 355 (1981). Frank's denial of intentional or knowing child abuse obviously did not weigh heavily with the jury, as is borne out by the guilty verdict. Michelle had told the doctors that Frank had hit her on the fingers, face and chest with a hammer and had struck her on the head with pliers and hit her in the face with his fist. She had bruises on the face and a chipped tooth. Frank admitted striking her on the face on a number of occasions out of anger. Michelle also testified that she went through prolonged periods of hunger and that when they would go to a fast food restaurant Frank would bring out two hamburgers and fries for himself and Barbara, but the food was not shared with her.

Frank testified that he had been a policeman in Washington, D.C., and that he was aware that there was a crime of child abuse and that it included injuring or starving a child. He admitted that there was obviously something wrong with her weight. The radiologist testified that x-rays of the child's bones revealed, through an examination of the bone structure, growth arrest lines compacted together, which was consistent with long-term malnourishment. A psychiatrist who had studied abused children and child abusers gave the following testimony:

"Q. Doctor, from all you know about this case, do you have an opinion as to whether or not the parents were aware of what was happening to the child here?

A. I think they must have been aware of her over all physical condition.

Q. And why is that, doctor?

A. Because she was kept isolated from others. It would seem obvious the one reason they didn't want others to view her, she was so different from the norm. I think they must have had some perception of what other children her age looked like."

The evidence is sufficient to sustain Frank's conviction of intentional or knowing child abuse. The evidence directly from the victim is also inconsistent with a less culpable mental state.

### III.

Was the sentence imposed excessive in light of those historically imposed for such crimes? This argument centers primarily around a letter directed to the trial court which set forth 16 cases where appellant contends the defendants were similarly situated, but whose sentences contrast sharply with the sentence given Frank. It is clear that a defendant has no guarantee to the same sentence that was imposed for the same crime in other cases. See *State v. Douglas*, 87 Ariz. 182, 349 P.2d 622 (1960), cert. den. 363 U.S. 815, 80 S.Ct. 1255, 4 L.Ed.2d 1157; *State v. Davis*, 105 Ariz. 498, 467 P.2d 743 (1970). Many features distinguish the examples set forth in Frank's lawyer's letter to the trial judge. All of the cases resulted from an admission of guilt and benefited from plea bargains or by being placed into a diversion program. The cooperative attitude of an admission of guilt distinguishes the instant case from the examples in the sentencing letter. See *State v. Killian*, 91 Ariz. 140, 370 P.2d 287 (1962). The five-year period over which the abuse occurred, the nature of the abuse and the "moderately high" likelihood of reoffending, as disclosed in the Court Clinic report, plus the high degree of culpability are all factors which clearly support the imposition of the enhanced presumptive sentence. The higher culpability and enormous physical abuse present in the instant case over a period of years, not months, together with Frank's

age and higher level of mental functioning, distinguish this situation from that in *State v. Swafford*, 21 Ariz.App. 474, 520 P.2d 1151 (1974). We find the sentence imposed to be well within the sentencing court's discretion and we will not interfere. See *State v. Malory*, 113 Ariz. 480, 557 P.2d 165 (1976).

## APPEAL OF BARBARA POEHNELT

### I.

■ Did the trial court err in not severing Barbara's trial from Frank's, and was she prejudiced by the refusal to give a cautionary instruction? The trial court initially severed the trials of Frank and Barbara on the prosecutor's motion and then joined them on the prosecutor's motion over Barbara's objection. Subsequent motions for severance by Barbara were also denied. Rule 13.3(b), Rules of Criminal Procedure, 17 A.R.S., provides:

"b. Defendants. Two or more defendants may be joined when each defendant is charged with each offense included, or when the several offenses are part of a common conspiracy, scheme or plan or are otherwise so closely connected that it would be difficult to separate proof of one from proof of the others."

The circumstances for joinder were present. Both defendants were charged with the same offenses. However, the joinder and severance rules must be read together. *State v. Curiel*, 130 Ariz. 176, 634 P.2d 988 (App.1981). Rule 13.4(a), Rules of Criminal Procedure, 17 A.R.S., dealing with severance, provides:

"a. In General. Whenever 2 or more offenses or 2 or more defendants have been joined for trial, and severance of any or all offenses, or of any or all defendants, or both, is necessary to promote a fair determination of the guilt or innocence of any defendant of any offense, the court may on its own initiative, and shall on motion of a party, order such severance."

Where the trial court does not grant a severance, a defendant must show "compel-ling prejudice against which the trial court was unable to protect." *State v. Cruz*, 137 Ariz. 541, 544, 672 P.2d 470, 473 (1983).

■ It is contended that the evidence of child abuse was more inflammatory against Frank than it was against Barbara. Although Barbara did not abuse Michelle by striking her, as Frank did, she was necessarily and substantially involved in the over-all child abuse scenario. A major factor in the case was the starvation of the child over a period of years. This could not have occurred without her cooperation and permitting the intolerable situation to continue. Indeed, as the prosecution points out, deprivation of food by one parent would have had little effect if the other parent was feeding the child. Barbara cooperated in concealing Michelle by keeping her from public restrooms and never providing a babysitter. When she and Frank went out Michelle was left tied in the room. Much of the testimony given by Frank was cumulative and exculpatory for himself and Barbara. He denied that they ate without feeding Michelle and explained that when they did not eat it was because they did not have money. He also explained that they did not realize the seriousness of the situation or they would have returned Michelle to her natural father. No objection was made by Barbara's attorney to any of Frank's testimony. Complaint that Frank's testimony opened the door to rebuttal about certain prior bad acts was directed entirely at Frank as the culprit. Any testimony implicating Barbara with reference to abusive conduct appears to be cumulative. We discern nothing from Frank's testimony that was prejudicial to Barbara. There is no prejudice to Barbara from bad acts committed solely by Frank. Cf. *State v. McCall*, 139 Ariz. 147, 677 P.2d 920 (1983). The very egregiousness of Frank's behavior may have blunted Barbara's culpability, not enhanced it, by comparison. Accordingly, the contention that a cautionary instruction should have been given to protect her from any prejudicial spill-over from Frank's testimony is also without merit.

## II.

█ Did the trial court err by refusing to sever the child abuse charge from the kidnapping charge until trial was underway and evidence had been admitted, which appellant argues was admissible only with reference to the kidnapping charge, and by refusing a cautionary instruction. In a special action to this court filed by the state, we ruled by order on June 24, 1982, that evidence was admissible as to the kidnapping count of prior acts outside of Arizona in order to prove intent. (2 CA–CIV 4470, filed June 24, 1982). Appellant argues that she was prejudiced in that evidence which was admissible only with reference to the kidnapping charge was improper as to the child abuse charge. We are not directed to a request for a cautionary instruction having been made. Indeed, it appears that such an instruction was rejected. Moreover, we are not directed to evidence admitted with reference to the kidnapping charge alone, nor do we find any that appears to have had any consequential effect upon the child abuse charge. The jury was told that the kidnapping charge had been withdrawn. The sole charge submitted to the jury with appropriate instructions was child abuse. We find no taint from its prior joinder with the kidnapping count. Cf. *State v. Grijalva*, 137 Ariz. 10, 667 P.2d 1336 (App.1983).

## III.

Is A.R.S. § 13–3623(B) unconstitutionally vague? Appellant's attack on the statute is directed primarily to the underscored portions of A.R.S. § 13–3623(B) which follow:

"Under circumstances likely to produce death or serious physical injury, any person who ..., having the care or custody of such child, causes or permits the person or health of such child to be injured or causes or permits such child to be placed in a situation where its person or health is endangered is guilty of an offense...." (Emphasis added)

Prior to trial, appellant's counsel moved for dismissal of the child abuse charge against her on the basis that the statute, and particularly the "placing in a situation" clause is unconstitutionally vague. Appellant complains that the prosecution argued for a broader, less active, less intentional theory for convicting Barbara, and that this theory was brought into focus in closing argument when the prosecutor argued:

"... Barbara Poehnelt was the mother of this child, she had custody of her, that having custody over that child, you allow—and I'll read you the whole statute, but you allow something like this to happen, knowing and being aware of what's going on, you're guilty of child abuse. You're just as guilty as if you inflicted that punishment and that malnutrition yourself.

\* \* \* \* \* \*

Another way of committing the crime would be under circumstances likely to produce death or serious physical injury, having the care or custody of such child, caused or permitted the person or health of that child to be injured, and we certainly have that in this case.

Third way of committing this crime is under circumstances likely to produce death or serious physical injury, having the care or custody of such child, that defendant caused or permitted such child to be placed in a situation where its person or health is endangered."

Appellant contends that the statute is defective in that it does not define "having the care or custody" nor "permits such child to be placed in a situation where its person or health is endangered."

In considering appellant's attacks on the statute, we bear in mind that statutes are presumed to be constitutional, and the burden is on the one attacking the statute to establish beyond a reasonable doubt that it is unconstitutional. See *New Times, Inc. v. Arizona Board of Regents*, 110 Ariz. 367, 519 P.2d 169 (1974). The special interest in protecting children is another factor affording broader leeway to legislation directed to that end. *New York v. Ferber*, 458 U.S. 747, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982).

■ Appellant first attacks the lack of definition for "care or custody." It is undisputed that she was Michelle's mother. The child traveled with her and was with her at all times in question, appellant apparently having received custody when she separated from Michelle's natural father, Herman Howell. It is clear that appellant falls within the ambit of having "care or custody" within the statute. In addition to ordinary dictionary definitions in the event of a genuine question as to the meaning of the term "custody," it is defined in the Arizona statutes so as to leave no doubt concerning the scope of parental responsibilities. See A.R.S. §§ 8–101(4) and 8–531(8).[1] The term is not vague and is readily susceptible to definition, if necessary. See *State v. Varela*, 120 Ariz. 596, 587 P.2d 1173 (1978). The terms "permission" and "situation" are ordinarily understood and need no further definition. Cf. *State v. Bice*, 127 Ariz. 312, 620 P.2d 227 (App.1980).

Appellant attacks the word "endanger," a word we found not to be too vague in *State v. deBoucher*, 135 Ariz. 220, 660 P.2d 471 (App.1982). Appellant argues that *deBoucher* is in error and that we should not follow it. It is argued that we should reconsider *deBoucher* in light of *Kolender v. Lawson*, 461 U.S. 352, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983), which dealt with a statute requiring persons stopped by the police to identify themselves in a "credible" fashion, without defining "credible." That statute lacked the focus provided by the preface to A.R.S. § 13–3623(B), "under circumstances likely to produce death or serious physical injury," which sets a clear standard as to the degree of risk involved in the proscribed endangering. In a similar statute the terms "substantial risk" and "duty of care" have been held to be adequately

clear. Cf. *State v. Sammons*, 58 Ohio St.2d 460, 391 N.E.2d 713 (1979).

The concern in *Kolender* for the First Amendment implications of the identification statute is not present in the instant case where appellant's challenge encompasses peripheral applications, arguing that if the statute is overbroad it must fall. The overbreadth concern for chilling First Amendment rights or at least Bill of Rights concerns is absent. See *State v. Carruth*, 132 Ariz. 368, 645 P.2d 1282 (App.1982). The concern for family integrity stems from the Fourteenth Amendment. See *Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972). As the state observes, the systematic starving of a child for four or five years to the point of obvious gauntness and to such an extent that the stunted growth motivated appellants to conceal the child, is not a borderline case. It falls within the core of the statute, and the possibility of vagueness in peripheral situations need not be considered. See *People v. Vandiver*, 51 Ill.2d 525, 283 N.E.2d 681 (1971). Even if First Amendment interests were implicated, they must accommodate to the overriding concern for protecting children. *New York v. Ferber*, supra; *Prince v. Commonwealth of Massachusetts*, 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944).

The child abuse statute is complex, in that the offense may be committed in alternative ways, but we conclude that it is not vague. We reaffirm the conclusion reached in *deBoucher* and we find the statute constitutional on its face and as applied.

## IV.

■ Did the pretrial publicity permeate the community and prejudice the community against appellant to such an extent that the trial court erred in refusing to change

---

1. The sections, which are practically identical, provide:

  " 'Custody or legal custody' means a status embodying the following rights and responsibilities:

  (a) The right to have the physical possession of the child,

  (b) The right and the duty to protect, train and discipline the child, and

  (c) The responsibility to provide the child with food, shelter, education and ordinary medical care...."

venue? Refusing a motion for change of venue is discretionary and will not be disturbed unless there is a clear showing of abuse of that discretion and prejudice to the defendant. *State v. Greenawalt,* 128 Ariz. 150, 624 P.2d 828 (1981), cert. den. 454 U.S. 882, 102 S.Ct. 364, 70 L.Ed.2d 191 (1981). The burden is on the defendant to show a probability of an unfair trial. *State v. Tison,* 129 Ariz. 546, 633 P.2d 355 (1981), cert. den. 454 U.S. 848, 102 S.Ct. 167, 70 L.Ed.2d 136.

The record does not disclose publicity reaching the outrageous circumstances which must be present to presume prejudice. *State v. Tison,* supra. Copies of newspaper articles appended to appellant's motion for change of venue reveal one article on October 25, 1981, one on the 26th, two on the 28th, two on November 5, one on the 8th, one on the 10th, one on the 11th, one on the 12th, one on the 13th, one on the 14th, and one on the 19th. We find nothing from our review of the articles that suggests such extreme circumstances in the nature of the publicity as to preclude the possibility of a fair trial, nor, in our opinion, does it achieve the status of inordinately sensational.

■ During voir dire, 11 persons were excused, but these were for neutral reasons, none for bias against the defendants. Of the 37 persons questioned, 19 had not heard of the case. Six of those were among the final 12–member jury. Five of the others on the jury had only a vague recollection of the case. The one juror with a significant recollection of the facts stated that he could be a fair and impartial juror. The jurors indicated that they would have no difficulty ignoring publicity and that they would follow the instructions of the court and adhere to the presumption of innocence and the requirement that the state be put to its proof of the charges beyond a reasonable doubt.

While the case did draw the community's attention, it appears that the newspaper articles are dated six months or more prior to the date of trial. The ease of jury selection also strongly suggests no great problem from extensive publicity pervading the community and influencing jurors to the point of prejudicing the defendants. We find no error in the trial court's denying appellant's motion for change of venue.

V.

Did the trial court err by denying appellant's motion to strike a juror for cause? The challenges by both defense counsel to have Mr. Soto removed from the panel for cause were denied. Although it is mentioned in appellant's brief that this juror acknowledged exposure to media coverage and that he had relatives who worked for the Tucson Police Department, the thrust of the argument on appeal is directed to the following colloquy which took place during voir dire:

"THE COURT: Mr. Soto, please.

Good afternoon, Mr. Soto. Have a seat, please. Mr. Soto, I think you told us you thought you heard something about the case before today, is that correct?

MR. SOTO: I had just read about it briefly, yes. I didn't tell you but—

THE COURT: I wasn't sure whether I marked my chart or not.

MR. SOTO: I vaguely remember about the case, not to, right at this moment, hearing too much about it.

THE COURT: All right. As a juror you would be sworn to decide the case based only on what happened here in the courtroom during the trial. You would be required to disregard whatever you might have heard before today. Do you think you would be able to do that?

MR. SOTO: Yes, sir.

THE COURT: Do you have children of your own, Mr. Soto?

MR. SOTO: Yes, sir.

THE COURT: What are their ages, sir?

MR. SOTO: My daughter is fourteen, my son is twelve.

THE COURT: O.K. The charges against these defendants in this case are that they abused and kidnapped a little nine-year-old girl and that that resulted in physical injuries and malnutrition, and

I'm wondering if just the nature of the charges might make you feel uncomfortable sitting as a juror in a case like this?

MR. SOTO: I wouldn't know, I've never been in this situation. I—I just don't know how to answer that question, your Honor.

THE COURT: O.K. Have you been a juror before?

MR. SOTO: Yes, I was on drugs.

THE COURT: You were on a drug case quite a while ago, weren't you?

MR. SOTO: Ten years ago approximately.

THE COURT: O.K., if we were picking the jury this morning, this afternoon, today for a drug case, armed robbery case or burglary case, would you have any different feelings as a prospective juror than you have right now or where you know what the charges are in this case?

MR. SOTO: I'll answer by saying I would rather be on robbery or drug jury than on the jury of this nature.

THE COURT: O.K. And are you telling us that you're going to be a little bit biased one way or the other, one side or the other, or are you telling us that you recognize that sitting as a juror in a case of this nature, is going to be more difficult than a drug case?

MR. SOTO: Yes, sir.

THE COURT: The latter?

MR. SOTO: More difficult for this one.

THE COURT: But you think you could be absolutely fair and impartial, start out with an open mind and start out, as you know, the defendants sit here as innocent persons and that the charges are no evidence whatsoever and require the State to prove guilt beyond a reasonable doubt before [you] would convict. Can you do that?

MR. SOTO: Yes, sir, I can, I believe I can.

THE COURT: Thank you, sir.

MR. TIERS: May I direct one question, sir?

THE COURT: Yes, you may.

MR. TIERS: Sir, would you be seated again for me, please. Why do you think it would be more difficult to sit on this jury than a robbery case?

MR. SOTO: Well, I, like my son is a little eager, I like kids, my daughter is a dancer, like to see her dance and—I guess that's the only way I can answer, I enjoy.

MR. TIERS: That's a good answer. Let me direct another question for you if I might. If we have evidence in this case that there's a little girl, nine-year-old girl and that that girl had been hurt, do you think the mere fact of being hurt would sadden you or upset you in such a way as to maybe—

MR. SOTO: Yes, it would sadden me.

MR. TIERS: It would sadden you, uh-huh. I have no further questions.

THE COURT: Mr. Cooper.

MR. COOPER: No.

THE COURT: Mr. Smith.

MR. SMITH: Mr. Soto, while it would sadden you to find out a little girl was hurt in this case, it wouldn't make you vote guilty unless you thought the State could prove beyond a reasonable doubt that the defendants were guilty of causing that hurt, would you?

MR. SOTO: I would listen to the evidence.

MR. SMITH: You know that sometimes a hurt can come from an accident, nobody is at fault when somebody gets hurt. What I'm trying to ask you, just because somebody is hurt that, itself, would sadden you, that won't make you vote guilty unless the State proves the defendants are guilty?

MR. SOTO: Yes, uh-huh.

MR. SMITH: So you still think you could be fair even though you would be saddened by some of the evidence?

MR. SOTO: Uh-huh.

MR. SMITH: O.K., thank you.

THE COURT: Thank you, Mr. Soto."

We do not read the record to disclose Mr. Soto's responses as equivocal and evasive as suggested by appellant. Although his responses may not be in absolutes, that is not necessary. See *State v. Clayton*, 109

Ariz. 587, 514 P.2d 720 (1973); *State v. Turrentine*, 122 Ariz. 39, 592 P.2d 1305 (App.1979).

▮ *State v. Rodriguez*, 131 Ariz. 400, 641 P.2d 888 (App.1981), relied upon by appellant, is distinguishable. There, the juror had been recently burglarized and demonstrated that she had serious misgivings about her impartiality because of that recent burglary. The case before the court was a burglary. We find that the trial court did not abuse its discretion in determining that Mr. Soto could sit as a fair and impartial juror. Cf. *State v. Tison*, 129 Ariz. 526, 633 P.2d 335 (1981), cert. den. 454 U.S. 848, 102 S.Ct. 167, 70 L.Ed.2d 136.

## VI.

Did the trial court commit reversible error in not allowing appellant's attempted jury waiver over the prosecutor's objection? Article 6, § 17 of the Arizona Constitution, as amended in 1960, provides:

> "The right of jury trial as provided by this Constitution shall remain inviolate, but trial by jury may be waived by the parties in any civil cause or by the parties with the consent of the court in any criminal cause."

A.R.S. § 13–3983, as amended, provides:

> "A trial by jury may be waived in criminal actions by the consent of both parties expressed in open court and entered on its minutes."

Rule 18.1(b), Rules of Criminal Procedure, 17 A.R.S., provides:

> "Waiver. The defendant may waive his right to trial by jury with consent of the prosecution and the court."

▮ In addition to the above provisions of the Arizona Constitution, the statute and the criminal rule require the consent of the parties in order for the jury to be waived in criminal proceedings. As appellant acknowledges, but protests, decisional law has also decided the matter. We find the authorities dispositive and decline to tamper with them. See *Patton v. United States*, 281 U.S. 276, 50 S.Ct. 253, 74 L.Ed. 854 (1930); *State v. Durham*, 111 Ariz. 19,

523 P.2d 47 (1974); *State v. Webb*, 19 Ariz. App. 73, 504 P.2d 1296, cert. den. 414 U.S. 863, 94 S.Ct. 84, 38 L.Ed.2d 119.

## VII.

Was appellant denied effective assistance of counsel? Prior to opening statements, appellant's attorney advised the court that appellant wished to have other counsel substituted for him. Barbara reported to the court that her attorney had told her "to get f____d and f__k the case." Her attorney explained that he had recently become aware of photographs which · he thought would be very important evidence in the case and that for reasons which he did not understand appellant would not release the evidence to him or allow him to get it and a dispute had arisen between ˙ them. The court, observing that it was obviously late in the proceedings to provide for a change of counsel, who had served appellant for eight months, denied the request.

▮ We note that the Sixth Amendment does not guarantee a "meaningful relationship" between an accused and counsel. *Morris v. Slappy*, 461 U.S. 1, 103 S.Ct. 1610, 75 L.Ed.2d 610 (1983). What is important is the quality of counsel's performance. *State v. Nash*, 143 Ariz. 392, 694 P.2d 222 (1985); *State v. Watson*, 134 Ariz. 1, 653 P.2d 351 (1982). In that connection, appellant contends on appeal that her attorney conducted minimal cross-examination of the witnesses for the prosecution and no cross-examination at all of the key prosecution witness, appellant's daughter. The manner in which cross-examination is handled is a tactical decision, and a low profile in dealing with certain witnesses, even to the extent of silence, may be the most effective trial tactic. *State v. Tison*, supra, 129 Ariz. at 556, 633 P.2d at 366. Appellant's attorney was forbidden by her to use certain material. She cannot complain of his representation for a decision she made. Cf. *McKaskle v. Wiggins*, 465 U.S. 168, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984). That the attorney stated that he was confused or did not understand certain aspects of the settling of instructions is not

equal to a confession of ineffectiveness as trial counsel. The statements were made in the context of discussion and arguments with reference to complex instructions. They do not translate into actions or inactions by counsel which worked to appellant's detriment. We find from the record that counsel's representation was consistent with prevailing professional norms, and there is no demonstration that appellant was prejudiced from counsel's representation. *State v. Nash*, supra.

### VIII.

■■■■ Did the trial court commit reversible error in not instructing the jury regarding A.R.S. § 13–3619? Appellant argues that this is a lesser-included offense. In determining whether this is so, we must examine whether the greater offense contains each element of the alleged lesser plus one or more elements not contained in the lesser. *State v. Tims*, 143 Ariz. 693, 693 P.2d 333 (1985). Stated another way, the test of whether an offense is lesser-included is whether the greater cannot be committed without necessarily committing the lesser. *State v. Caudillo*, 124 Ariz. 410, 604 P.2d 1121 (1979). This requires an examination of the elements of the offenses, *State v. Caudillo*, supra, and *State v. Teran*, 130 Ariz. 277, 635 P.2d 870 (App. 1981). The elements of A.R.S. § 13–3623(B), the greater offense of child abuse, as it pertained to this case, are:

(1) Circumstances likely to produce death or serious physical injury,

(2) The custodian or caretaker,

(3) Causes or permits injury to a child, or

(4) Causes or permits child to be placed in a situation where its person or health is endangered, and

(5) The degree of culpability runs from intentional to criminally negligent.

The elements of A.R.S. § 13–3619, the family offense charge, which appellant contends should have been included as a lesser-included offense, are:

(1) Custodian of a minor under sixteen years of age.

(2) Knowingly causing or permitting life endangerment, injured health or imperilment of moral welfare by.

(3) Neglect, abuse or immoral associations.

In view of additional elements that are found in A.R.S. § 13–3619, age differences in the children protected, the inclusion of imperilment of moral welfare as an injury, and the inclusion of immoral associations as proscribed conduct, the trial court properly refused the requested lesser included instruction. *State v. Teran*, supra. There was no factual dispute concerning the elements differentiating the greater from the lesser. Thus, the defendant was either guilty of the crime charged or not at all. *State v. Williams*, 144 Ariz. 479, 698 P.2d 724 (1985).

### IX.

Did the trial court commit reversible error in denying a mistrial based upon the child's remarks? The remarks included statements by Michelle and conduct which appellant contends hopelessly prejudiced the jury. At one point, Michelle stated:

"Know what? Barbara just smiled at me."

Later Michelle asked, "Are you mad at me, mommy?" A recess was taken, and as Michelle was leaving the stand, some commotion took place which defense counsel placed in the record as follows:

"MR. TIERS: Your Honor, at this time I'm going to move for a mistrial on the basis of what just happened between the jury and the child. Upon leaving the courtroom, she left the witness stand and said in front of the jury: Don't let them hurt me. I don't like them and I move for a mistrial on the grounds that the jury has been hopelessly prejudiced.

MR. COOPER: Judge, I would join in that motion. I think it should be reflected that she was crying quite hard at that time and I believe it was in response to Barbara Poehnelt smiling at her."

■■■■ The judge stated that he observed Barbara's conduct and the request for a mistrial was denied. In connection with his

request for a mistrial, appellant's attorney stated:

"I would I suppose ask also for a cautionary instruction."

We are not directed to a formal request and denial of such cautionary instruction. The court instructed the jury that they must not be influenced by sympathy or prejudice. We defer to the trial court's assessment of any effect the exchange had on the jury, and we find no abuse of discretion in failing to order a mistrial. *State v. Williams*, 121 Ariz. 213, 589 P.2d 456 (App. 1978).

## X.

Was the evidence sufficient to find appellant guilty of intentional or knowing child abuse and for the finding of dangerous nature? Appellant makes a very brief one-page argument under this contention and asserts that the trial court erred by denying her motion for judgment of acquittal and her motion for new trial and premises the argument on the reasons that the state

"when evidence which was inadmissible against Barbara Poehnelt, or of acts which were not part of the bill of particulars or occurred prior to the enactment of the child abuse statute or were otherwise inadmissible are excluded from consideration, failed to provide evidence from which a reasonable jury could find beyond a reasonable doubt that Barbara Poehnelt was guilty of the crime of child abuse, or was guilty of intentional or knowing child abuse or that there was sufficient evidence for the finding of dangerous nature with respect to Barbara Poehnelt."

The indictment charged child abuse from January 1980 through October 23, 1981. The statute, § 13–3623, was enacted in 1979. Appellant was not convicted for any act occurring before the effective date of the statute. Although the evidence indicates that the malnourishment interfered with her growth process for a relatively long period of time, perhaps over a five-year period, the evidence was admissible to show the complete story, intent, knowledge and lack of mistake under Rule 404(b), Rules of Evidence, 17A A.R.S.

We have been directed to no evidence that was improperly admitted. The evidence of prolonged malnourishment was abundant, as was the evidence of the serious consequences. The long duration of the deprivation of food while the child was in Barbara's continuous care and custody and, indeed, her participation in that deprivation and in permitting the other abuse to continue over a prolonged period during which it could have been avoided through reasonable and available choices, was substantial evidence sufficient to support the conviction. *State v. Tison,* supra.

## XI.

Was the sentence imposed excessive? Appellant argues that the trial court did not adequately take into account the circumstances of the offense, appellant's background and the relative culpability of the two defendants and that the sentence imposed was, therefore, excessive. Appellant and her co-defendant were sentenced to 10.5 years' imprisonment, the presumptive term for a class 2 felony enhanced because of the dangerous nature. It is argued that the sentence is excessive because it is not in conformity with the *ABA Standards Relating to Abuse and Neglect.* The public policy in Arizona is to "impose just and deserved punishment on those whose conduct threatens the public peace." A.R.S. § 13–101(6). The trial court imposed the presumptive sentence, which is to be expected in the vast majority of first offenders. See *State v. Bly,* 127 Ariz. 370, 621 P.2d 279 (1980). At the conclusion of the aggravation/mitigation hearing, the court stated that it was unable to find sufficiently substantial aggravating circumstances or mitigating circumstances to impose other than the dangerous nature presumptive sentence. Appellant's approach on appeal is to emphasize positive factors on her behalf. Included in the presentence material is the court clinic's evaluation that "no psychosis or other form of impaired reality testing" was present at

the time of the offense. It appears in the material that appellant showed little remorse and that there was a moderately high potential for further abuse. Appellant's position as the child's natural mother imposes a greater responsibility on her for the child's protection. It appears that this responsibility could have easily been fulfilled by contacting appellant's own mother or the child's natural father. Appellant's conduct, rather, appears to have been consistently calculated to further the concealment and prolongation of the abuse. We find no abuse of the trial court's discretion in imposing the presumptive, enhanced sentence.

### XII.

■ Did the trial court commit reversible error when it permitted the state's expert witnesses to use the term "battered child syndrome"? For a collection of cases permitting the admission of such evidence, see Annotation, "Admission of Expert Medical Testimony on Battered Child Syndrome," 98 A.L.R.3d 306 (1980). The term was used without comment one way or the other in *State v. Turrubiates*, 25 Ariz.App. 234, 542 P.2d 427 (1975). Expert testimony to establish that injuries were intentional and not accidental has been held admissible. See, e.g., *State v. Gillies*, 135 Ariz. 500, 662 P.2d 1007 (1983); *State v. Owens*, 112 Ariz. 223, 540 P.2d 695 (1975). In the instant case, the objection was made that to permit such expert testimony would invade the province of the jury on the ultimate fact. The witness qualified as an expert on the recognition of a medical phenomenon, the battered child syndrome. The trial court ruled that the expert witnesses could refer to it as such even though it bore upon the ultimate issue. We agree. See Rule 704, Rules of Evidence, 17A A.R.S.

### XIII.

■ Did the trial court commit reversible error in permitting the introduction of evidence of psychological injury to Michelle? Appellant argues that such non-physical injuries were not within the purview of the statute under which appellant was charged. Because appellant was convicted under A.R.S. § 13–3623(B), and the instructions given on that charge do not refer to emotional injury, it is clear that the evidence given did not affect the verdict and was harmless.

### XIV.

The issue appears to be duplicated in issue XVII and will not be discussed here.

### XV.

■ Did the trial court abuse its discretion in denying a mistrial after Dr. Pitt referred to the victim having fractures? The granting of a mistrial is a serious remedy which is left to the sound discretion of the trial court and will not be upset unless plainly abused. *State v. Christenson*, 129 Ariz. 32, 628 P.2d 580 (1981). We find no error in the trial court's refusal to grant a mistrial. Less drastic remedial measures could have been requested but were not. Id.

### XVI.

The issue appears to be duplicated in issue XVII and will not be discussed here.

### XVII.

Did the trial court commit reversible error in denying appellant's right to confrontation when it allowed testimony regarding statements allegedly made to the police or medical staff by Michelle and when it denied appellant's motion to obtain the reappearance of Michelle concerning the alleged statements? The statements made to law enforcement authorities were made shortly after Michelle had been found gagged and hog-tied in the darkened motel room. Detective McQuade said that

"it took awhile to calm her down to where she was speaking clearly, and I started talking to her after she got, about the food and in different questions. When she settled down, had some food in her stomach, I would say fifteen to thirty

minutes after my initial arrival, I began to question her and she would answer."

Objection was made that Michelle's statements were not admissible as excited utterances. The court ruled that anything said at the motel would be admissible. The court's ruling must be considered in the context of the following scene which we have drawn from the record:

"Q. O.K., what did you observe when you entered the room?

A. As I said the lights were off and we did a very brief search of the room and established that the screams were coming from the back portion. We turned on the lights and went back to the back of room No. 4 and there was a bed along the wall, and on the bed was a bundle and it was a blanket, and underneath the blanket there was movement and that was where the screams were coming from.

Q. What did you do at that point, sir?

A. Myself and Deputy Lacy went back to that bed and I peeled back the blankets. I didn't know what was underneath there and I found a child, a young child, was gagged and hog-tied, hands and feet bound behind her back with socks.

Q. Was she on her back or on her stomach, sir?

A. I think she was on her back and her legs and arms were pinned behind her because as I looked, I was shocked. At first I thought her legs were amputated because I couldn't see the calf portion of her legs so I believe she was on her back. We rolled her over on her side and she was screaming. The first thing we did was we took off the gag and she said: Don't hurt me anymore. Don't hurt me anymore.

Q. What was the tone of her voice when she said that?

A. Oh, she was—it sent chills up my spine so to speak. They were loud, they were guttural, they were panic stricken. The little girl was terrified.

[Objection, overruled.]

A. —After well, as she continued to scream, we untied the knots that her hands and feet were bound with with the socks.

\*    \*    \*    \*    \*    \*

A. It was a type of a square knot. They were not bow ties. They were tight. It took several minutes to get her untied. Of course, she was squirming a little bit but that didn't make any difference. She wasn't real big, it wasn't a struggle, but the knots were real tight and there were a lot of them.

\*    \*    \*    \*    \*    \*

A. She was struggling and turning her body violently at first, and then when she realized we weren't going to hurt her, she calmed down a little bit so that we could get her untied, and she kept saying: Don't hurt me anymore.

Q. How long did she continue to state: Don't hurt me anymore?

A. Oh, perhaps a minute and a half to two minutes, and then when we got her untied, she was in a state of intensified— she was in an intensified emotional state for probably 10 to 15 minutes. We finally got her calmed down to where she began to speak real clearly and so forth.

Q. Did she have trouble speaking at first, sir?

A. Yes. I kept asking her what her name was and she mumbled, she kind of talked like this (indicates) and it was inaudible, and as the time went on, she began to speak more clear, and I determined that probably part of that was because of the, well, the gag she had in her mouth through her lips, was so tight that her jaw or muscles in her cheeks may have been numbed.

MR. COOPER: Judge, I would object to that conclusion, he just stated she was screaming with no gag on her.

THE COURT: Sustained.

MR. COOPER: Thank you.

Q. (Mr. Smith) Deputy, or Detective McQuade, after she began to calm down somewhat, did you have any conversation with her about food?

A. Well, right after I untied her, her attention span was not very good. She went right over to the kitchen area of room No. 4 and proceeded to make herself a ketchup sandwich. There was several tubes of ketchup like you get at a Taco Bell or convenience store and ripped one open and put it on a piece of bread and spread it out and wolfed it down. She was famished."

■■■ The record clearly shows that the child was in a highly excited state and extremely fearful. We find the statements to have been properly admitted as excited utterances under Rule 803(2). Also see *State v. Hunt*, 2 Ariz.App. 6, 406 P.2d 208 (1965). Statements about her being hungry and cold were also admissible under Rule 803(3), as statements of her then-existing state of mind and physical condition. Much of the evidence in question also came out when the child testified.

■■■ The statements made to Dr. Rachesky, the next morning, cannot be classified as excited utterances because of the lapse of time. On rebuttal, Dr. Rachesky testified that Michelle had told her how Frank had inflicted injuries that the doctor found on her body. She also had told the doctor that her parents did not feed her. The doctor testified that her questions to the child were for the purpose of diagnosis and treatment, explaining:

"A. In pediatrics an integral part of our diagnosis and treatment is the health care and the care of children, and if you suspect that a child may have been abused, that's a diagnosis and also warrants treatment, hence you need to determine whether or not any injuries that child has is [sic] accidental or inflicted."

This explanation was elicited from the doctor on voir dire examination by defense counsel. Objection previously was made to the doctor's recounting prior bad acts because appellant's attorney would be unable, without a continuance, to cross-examine the child, who had returned home to North Carolina. The instant case is distinguishable from this court's recent opinion by a divided court in *State v. Reidhead*, 146

Ariz. 314, 705 P.2d 1365 (1985), in that here the victim took the stand and was cross-examined. Refusal of the court to grant a continuance to obtain her reappearance after the rebuttal testimony by Dr. Rachesky must be left to the sound discretion of the trial court. Cf. *State v. Blodgette*, 121 Ariz. 392, 590 P.2d 931 (1979). We find no abuse of that discretion. The victim had been available for cross-examination and could have been placed under subpoena. The trial court had even suggested the advisability of doing so. Moreover, no prejudice is shown by not continuing the trial to make her again available.

### XVIII.

■■■ Was reversible error committed during the cross-examination of Frank Poehnelt? Complaint is made that the prosecutor should not have cross-examined Frank as to whether he had hit Michelle with pliers. Michelle had related that her step-father had hit her with a pair of pliers. Multiple scars revealed to the doctor that they were consistent with having been done with pliers. Nothing in the evidence indicates that Barbara was present or that she had any connection with this particular assault. We find no prejudice to her.

### XIV.

■■■ Did the trial court commit reversible error when it permitted the introduction of Florida school records during the testimony of a Child Protective Services (CPS) worker? The witness testified that the records were used in formulating her expert opinion that the child had been abused and neglected for a long time. The record was thus admissible under Rule 703, Rules of Evidence, 17A A.R.S., as well as under the public records exception to the hearsay rule, Rule 803(8).

### XX.

■■■ Did the trial court commit reversible error when it allowed a CPS worker to testify regarding an incident at an ice cream parlor where Michelle allegedly saw a woman who looked like her mother? The

witness testified to an incident where the child mistook a woman for her mother and said that she did not want to go with the woman. Appellee responds that the statement did not violate the hearsay rule because of the exception for statements of then-existing mental or emotional state, but that the testimony should not have been permitted because it was irrelevant, as the child's mental state was not in issue. The state argues, however, that the statement was innocuous in that the child merely stated that she did not want to go with the woman, not that she was fearful of her. We agree that if it was error to admit the testimony, it was harmless.

## CONCLUSION

After having reviewed the lengthy record and the numerous points raised on appeal, we do not find reversible error and affirm the convictions and sentences of both appellants.

LACAGNINA and LIVERMORE, JJ., concur.