951 P.2d 869

**STATE of Arizona, Appellee.**

v.

**David Anthony TROSTLE, Appellant.**

No. CR–94–0175–AP.

Supreme Court of Arizona, En Banc.

Dec. 24, 1997.

Grant Woods, Attorney General by Paul J. McMurdie, Chief Counsel, Criminal Appeals, Rory L. Whipple, Assistant Attorney General, Phoenix, for Appellee.

Laura E. Udall, Cooper & Udall, Tucson, for Appellant.

## OPINION

ZLAKET, Chief Justice.

Defendant, David Anthony Trostle, was indicted on charges of first degree murder, armed robbery, kidnapping, sexual assault, and theft by control. Following trial, a jury found him guilty of all but the assault. The court sentenced him to death for the murder, to consecutive 14–year prison terms for armed robbery and kidnapping, and to a concurrent 10–year term for theft. This automatic appeal followed. We have jurisdiction pursuant to Ariz. Const. art. VI, § 5(3), A.R.S. § 13–4031, and Rule 31.2(b), Ariz. R.Crim.P.

## FACTS

Ellen Marie Knauss was reported missing on September 21, 1993. Within 24 hours, her Toyota 4–Runner truck was spotted in the parking lot of a Tucson apartment complex. Police set up surveillance and questioned various individuals observed near the vehicle. They eventually obtained the names of two suspects—Trostle and 14–year–old Jack Jewitt. Defendant was apprehended the following evening, made conflicting inculpatory statements, and led police to a remote desert area where Knauss's body was later found.

According to defendant, Jewitt had wanted a four-wheel drive truck and sought his help in "jacking" one. Around 6:00 p.m. on Sunday, September 19, they went to the parking lot of the Tucson Mall, where Jewitt first picked out a blue Suzuki. When its owner came out of the shopping mall escorted by a security officer, however, Jewitt set his sights on Knauss's Toyota. While waiting, he allegedly said, "Fuck it, we'll just do this all the way." Defendant told police he thought this meant Jewitt intended to kill the owner of the truck.

Knauss, a part-time employee of an inventory company, signed out of work that night at 11:48 p.m. and exited the mall. Defendant stated that Jewitt approached her with a sawed-off shotgun as she was getting into her truck. He ordered her to move over and open the passenger door. Once Jewitt had control of the vehicle, defendant got into the driver's seat. Jewitt held the weapon to the back of the victim's head while defendant drove to an isolated area outside of town. There, defendant took her into the desert and forced her to remove her clothing.

At 12:35 a.m., a Tohono O'Odham tribal police officer observed the Toyota parked alongside Mission Road and stopped to investigate. Jewitt, seated in the front passenger seat, told him that the truck had broken down and his uncle had gone to seek help. Having satisfied himself that the vehicle was not stolen, the officer left to search for the fictitious uncle. Thereafter, Jewitt joined defendant, who had tied Knauss's hands and ankles with her underwear, and allegedly exclaimed, "Time to get ready to go." Jewitt is then reported to have said, "We'll do it execution style. That way, that way it'll look like we didn't do it." According to defendant, while Knauss kneeled on her clothing, Jewitt fired the 12–gauge shotgun into the back of her head.

Jewitt was tried separately as an adult and found guilty of first degree murder, armed robbery, kidnapping, and theft by control. He was sentenced to life imprisonment without possibility of release. Following defendant Trostle's convictions, the trial court found two aggravating factors—that there was an expectation of pecuniary gain, A.R.S. § 13–703(F)(5), and that the killing was especially heinous, cruel or depraved, A.R.S. § 13–703(F)(6). Believing that the mitigation evidence was insufficient to call for leniency, the judge sentenced him to death.

## TRIAL ISSUES

### VENUE

This "carjacking" murder received extensive media coverage. Defendant argues that

the trial court erred in denying his motion for change of venue because the pretrial publicity was so pervasive and unfair that prejudice should have been presumed. Alternatively, he claims the jurors were actually prejudiced.

A trial court's ruling on a motion for change of venue will not be disturbed on appeal absent a prejudicial abuse of discretion. *State v. Salazar*, 173 Ariz. 399, 406, 844 P.2d 566, 573 (1992). For prejudice to be presumed, the defendant must show "that the publicity was so unfair, so prejudicial, and so pervasive that we cannot give any credibility to the jurors' answers during voir dire affirming their ability to decide the case fairly." *State v. Bible*, 175 Ariz. 549, 565, 858 P.2d 1152, 1168 (1993). This burden is extremely heavy and rarely met. *Id.* at 564, 858 P.2d at 1167.

Defendant documented 65 television broadcasts and 15 newspaper articles disseminated in the Tucson area prior to trial. Forty of the TV reports occurred within the first week following the victim's disappearance. Although most described only the facts of the crime, several highlighted increased mall protection and how shoppers could avoid being victimized. In our view, general reporting of the need for security in public areas and of citizens' vulnerability to random violence falls short of an "attempt [by the media] to whip up hysteria and passion in the community." *Bible*, 175 Ariz. at 565, 858 P.2d at 1168. We cannot say that this coverage was unfair or pervasive. The remaining stories, broadcast on only 8 days over a 3–month period, focused on whether Jewitt would be tried as an adult. Unquestionably, the publicity diminished with the passage of time; the last TV broadcast aired several months before the start of trial.

Two of the newspaper articles contained evidence of prior bad acts not admitted at trial. In one, defendant was described as having had a history of molesting children. In the other, the prosecutor was interviewed regarding defendant's conviction for an unrelated car theft two weeks before the trial of this case began. He commented that the earlier crime displayed a similar motive as the carjacking in question. A review of ev-

erything submitted by defendant, however, reveals that these two articles were "exceptions to the largely factual information in the great bulk of the news reports." *Bible*, 175 Ariz. at 564, 858 P.2d at 1167. Furthermore, although 31 of 34 prospective jurors on the panel had some knowledge of the crime, the vast majority stated they remembered few, if any, details. Reviewing the record as a whole, we believe the trial was not "utterly corrupted" by publicity such that prejudice must be presumed. *See id.* at 565, 858 P.2d at 1168.

To prove actual prejudice, the defendant "must show that the jurors have formed preconceived notions concerning [his] guilt and that they cannot lay those notions aside." *State v. Chaney*, 141 Ariz. 295, 302, 686 P.2d 1265, 1272 (1984). The appropriate inquiry focuses on the effect of pretrial publicity, and mere knowledge of the case is insufficient to disqualify a juror. *Id.* Of the 46 panelists questioned about media coverage, 8 expressed views regarding defendant's guilt and were immediately dismissed. Most of those remaining recalled little or nothing of the news reports. Additionally, two of the jurors who sat on the case had no knowledge of the offense, and all 12 indicated that they could decide the issues solely on the basis of the evidence presented at trial. The court's denial of the motion for change of venue was within its sound discretion. *See State v. Eastlack*, 180 Ariz. 243, 253, 883 P.2d 999, 1009 (1994).

Defendant also argues that the trial court conducted inadequate voir dire. He claims that the judge should have probed the prospective jurors' knowledge and biases stemming from pretrial publicity by utilizing written questionnaires, as well as individual, small group, or private examination at the bench. When jury selection began, the judge stated:

I am going to be asking for a show of hands of people that think they may have seen or heard about this case in some form. And then I will ask you what if anything you may have seen or heard about it, that is, have you seen something

about it on TV, have you read about it in the newspaper.

Now when I am talking to you I don't want you to tell me exactly what details you remember because what you say might have an impact on one of the other jurors who may not have seen or heard about the case. See what I am saying? I don't want what you say to effect [sic] these other jurors. So just kind of keep your responses tailored to my questions, if you would.

Defendant did not object to this limiting instruction and at no time requested further inquiry of any particular juror. Other than initially asking that voir dire be conducted by counsel, the defense made no objections to the scope or adequacy of the selection process.

■ The trial court examined each person about his or her media exposure, memory of details, and ability to keep an open mind. It also asked questions requested by defendant, who ultimately passed the panel. Although the court might have conducted a more extensive voir dire using other techniques, defendant's failure to object precludes any claim on this basis. *Bible,* 175 Ariz. at 570, 858 P.2d at 1173. Waiver aside, the court did not abuse its discretion. None of the jurors exhibited a closed mind. All stated that they could follow the court's instructions and decide the case on the evidence. *Id.* at 572, 858 P.2d at 1175.

## BATSON CHALLENGES

■ The prosecution exercised two peremptory strikes to remove the only Hispanic members of the panel. Defendant made a *Batson* challenge, 476 U.S. 79, 89, 106 S.Ct. 1712, 1719, 90 L.Ed.2d 69 (1986), and the court, by requesting explanations for the strikes, implicitly found that a prima facie showing of racial discrimination had been made. *See State v. Hernandez,* 170 Ariz. 301, 304, 823 P.2d 1309, 1312 (App.1991). The prosecutor replied that one of the jurors had previously served on a criminal jury that returned not guilty verdicts and the other had expressed concern about not getting paid if he were selected. The court denied the motion, finding the explanations to be "ethical reasons for excusing those two jurors."

■ Defendant argues that the prosecutor's explanations were not objectively verifiable, as required by *State v. Cruz,* 175 Ariz. 395, 399, 857 P.2d 1249, 1253 (1993), and thus not race neutral. We disagree. In *Cruz,* the prosecutor struck a Hispanic juror because he believed she was "weak," had "poor contact" with him, and "felt she would be led." *Id.* We held that such purely subjective impressions of a juror's qualities had to be coupled with objective support to overcome a prima facie showing of discrimination. *Id.* Without examining the continued validity of *Cruz* in light of the U.S. Supreme Court's more recent decision in *Purkett v. Elem,* 514 U.S. 765, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995), we can say that participation on a prior acquitting jury is not the type of "wholly subjective" reason implicated therein. Rather, it is a facially objective basis for a peremptory challenge, unrelated to race or gender. *See State v. Castillo,* 156 Ariz. 323, 325, 751 P.2d 983, 985 (App.1987); *Garza v. State,* 739 S.W.2d 374, 375 (Tex.App.1987). Similarly, a prospective juror's expressed reluctance to serve due to financial hardship is a legitimate rationale for a peremptory strike. *See State v. Sanderson,* 182 Ariz. 534, 540, 898 P.2d 483, 489 (App.1995).

■ In a footnote, defendant also complains that two of the prosecutor's peremptory strikes were not gender neutral. This claim was waived by failing to raise it in the court below. *Cruz,* 175 Ariz. at 398, 857 P.2d at 1252. Additionally, the issue has been presented here without argument and is therefore precluded. *Id.* at 401, 857 P.2d at 1255.

## CHALLENGES FOR CAUSE

■ Defendant challenged for cause three panelists during voir dire and one seated trial juror. Under Rule 18.4(b), Ariz. R.Crim.P., cause to excuse a juror exists "[w]hen there is reasonable ground to believe that [he or she] cannot render a fair and impartial verdict." Because the trial court observes firsthand a juror's demeanor and credibility, its ruling will not be disturbed absent a clear abuse of discretion. *State v. Lavers,* 168 Ariz. 376, 390, 814 P.2d 333, 347

(1991). Moreover, the burden of establishing that a juror was not fair and impartial rests with the party challenging the court's failure to strike. *Id.*

Defendant argues that the trial court abused its discretion by denying his request to excuse venirepersons Douglas, Lindahl, and Gibbs. Douglas had once sat on a jury that convicted in a similar type of case, and defendant believed his voice sounded "bitter" while describing the incident. Lindahl and Gibbs had personal experiences with violent crime that defendant feared would evoke emotional responses. Upon questioning, however, all three jurors indicated they could be fair and impartial, and defendant has presented no evidence to the contrary. Because prejudice will not be presumed but must appear affirmatively from the record, the court did not err. *See State v. Reasoner,* 154 Ariz. 377, 384, 742 P.2d 1363, 1370 (App.1987).

Defendant further asserts that Douglas and Lindahl should have been stricken because they gave ambiguous responses about pretrial publicity. Douglas responded, "I guess," when asked if he could keep an open mind, and Lindahl said he did not "believe" the publicity would affect his ability to do the same. Because defendant did not challenge on these grounds in the trial court, the arguments are waived. *Encinas v. State,* 26 Ariz. 24, 27, 221 P. 232, 233 (1923), *overruled on other grounds, State v. Huerta,* 175 Ariz. 262, 855 P.2d 776 (1993); *State v. Bravo,* 131 Ariz. 168, 171, 639 P.2d 358, 360 (App.1981). In any event, the claims are meritless. A juror's assurance of impartiality need not be couched in absolute terms. *E.g., State v. Clayton,* 109 Ariz. 587, 592–93, 514 P.2d 720, 725–26 (1973) (juror "would try" to follow instructions); *State v. Poehnelt,* 150 Ariz. 136, 146, 722 P.2d 304, 314 (App.1985) (juror "believed" he could be fair and impartial).

Without argument and for the first time on appeal, defendant challenges the discharge of a venireman who had interrupted the selection process to inform the court that he did not believe in the jury system. Defendant waived this issue below and has effectively done so here. *See State v. Kemp,* 185 Ariz. 52, 57, 912 P.2d 1281, 1286, *cert. denied,* —— U.S. ——, 117 S.Ct. 117, 136 L.Ed.2d 68 (1996).

Lastly, defendant claims juror Ahlstrom should have been dismissed. On the second day of trial, Ahlstrom requested a private meeting with the judge. That morning, she had stopped by her workplace and was told by a supervisor that Trostle was a former employee. Together they looked up his employment record because the juror wanted to know when he worked there and why he was let go (repeated absences). In chambers with the judge and both counsel, Ahlstrom said, "I don't recall seeing him on the job or anything but I did want you to know that I may have said hello to him in passing...." She also asserted that she was not influenced by the information, would not discuss it with other jurors, and could reserve judgment until the end of trial. The court subsequently denied defendant's request for her dismissal. At the close of the evidence, Ahlstrom was randomly chosen as an alternate.

Defendant argues that his right to a fair and impartial jury was violated because Ahlstrom was not excused. While the trial court certainly would have been justified in striking the juror for violating its admonitions, *see State v. Cook,* 170 Ariz. 40, 54, 821 P.2d 731, 745 (1991), the refusal to remove her was not an abuse of discretion. Ahlstrom assured the court that she had not discussed the trial with her supervisor nor formed an opinion regarding the case. It appears that she was more concerned about reporting her previously unknown connection to defendant. The court satisfied itself that she could be fair and impartial, and defendant failed to establish otherwise.

Defendant also claims that the jury may have received harmful extraneous evidence from Ahlstrom and that the court should have determined whether such information influenced the verdict. He did not, however, request an evidentiary hearing nor move for either a mistrial or new trial. Any claim that the verdict was tainted by extrinsic evidence was thus waived. Moreover,

**14**

defendant has failed to show prejudice from the juror's misconduct, and this is not a case in which it can be presumed from the facts. *Cf. State v. Miller,* 178 Ariz. 555, 875 P.2d 788 (1994) (third-party communication related directly to ultimate issue of defendant's guilt or innocence). Ahlstrom did not participate in the deliberations, her information pertained only to defendant's prior work history, and nothing in the record suggests she shared this knowledge with other jurors. *See, e.g., State v. Spears,* 184 Ariz. 277, 289, 908 P.2d 1062, 1074 (1996) (finding no prejudice, in part, because record did not show whether jurors were exposed to extraneous information). The trial court's failure to inquire *sua sponte* if the verdict had been tainted was not error.

## ADMISSION OF DEFENDANT'S STATEMENTS

At police headquarters following his arrest, defendant was given *Miranda* warnings. After indicating that he understood his rights, he agreed to answer questions and subsequently made three taped statements. The first began at 6:51 p.m. It ended over two hours later when he agreed to accompany detectives to the Tucson Mall and show them where the truck had been parked. While in transit, he answered more questions, eventually admitting that he knew where the victim's body was located. This statement ended at 10:47 p.m. when they reached Mission Road and detectives began searching the desert. Over the next two hours, he remained in the police car and allegedly slept. At 1:23 a.m., following their return to headquarters, detectives interrogated defendant for another 15 minutes. Their questions included whether he had ever asked for a lawyer or indicated that he did not want to answer questions, and whether he had been promised anything or threatened. He answered each in the negative.

■ Defendant argues that *Miranda* was violated because he never explicitly waived his rights and because the warnings were not repeated at any point during the 7-plus hours of interrogation. We disagree. Defendant did not hesitate in answering questions and at no time asked to stop or

speak with an attorney. "Answering questions after police properly give the *Miranda* warnings constitutes a waiver by conduct." *State v. Tapia,* 159 Ariz. 284, 287, 767 P.2d 5, 8 (1988); *State v. Knapp,* 114 Ariz. 531, 538, 562 P.2d 704, 711 (1977). Moreover, absent circumstances suggesting that a suspect is not fully aware of his rights, there is no obligation to repeat them. *State v. Henry,* 176 Ariz. 569, 577, 863 P.2d 861, 869 (1993); *State v. Gilreath,* 107 Ariz. 318, 319, 487 P.2d 385, 386 (1971)(12– and 36–hour gaps between interrogations). Defendant does not reference, and we cannot find, anything in the record suggesting that he was not fully aware of his rights during the entire questioning period.

■ Defendant also asserts that his statements were not made voluntarily. Because confessions are prima facie involuntary, the state has the burden of showing voluntariness by a preponderance of the evidence. *State v. Scott,* 177 Ariz. 131, 136, 865 P.2d 792, 797 (1993). The trial court must look at the totality of circumstances to decide whether police conduct constituted overreaching. *Id.* Because this inquiry is highly fact-intensive, a court's finding will not be disturbed absent clear and manifest error. *State v. Lopez,* 174 Ariz. 131, 137, 847 P.2d 1078, 1084 (1992).

■ In support of his involuntariness claim, defendant points to the absence of counsel during interrogation, the failure to repeat *Miranda* warnings, and his lack of food and sleep. As already noted, however, he freely answered questions, never requested an attorney, and did not ask to stop or take a break. Furthermore, the detectives gave him coffee and let him sleep while they searched for the victim. Although they never offered him food, at no time did defendant indicate he was hungry or request something to eat.

■ Defendant also argues that his statements were improperly induced with promises of leniency. A confession is involuntary if it was made in reliance on an express or implied promise. *State v. Amaya–Ruiz,* 166 Ariz. 152, 165, 800 P.2d 1260, 1273 (1990). Defendant focuses on two com-

ments made during the interrogation. In the first, detectives encouraged him to tell the truth because they were talking to Jewitt as well: "We're giving you the opportunity to win the contest [against Jewitt]. Okay? Because it's a big contest … this is a bigger contest than you've ever been in before." While en route to the mall, a detective said, "Help us out the best you can. That's all we ask. Be honest with us and help us out and it'll work out in the long run."

On the surface, these two remarks appear to imply that defendant would receive some type of reward in exchange for his cooperation. We need not determine whether they amounted to promises, however, because the record establishes clearly that he failed to act in reliance on either one.

At the outset of the interrogation, defendant claimed that Jewitt had "borrowed" the truck from a friend at the mall. Within the first half hour, he acknowledged that the Toyota had "probably" been stolen by Jewitt but denied knowing anything about it. Soon thereafter, detectives reminded him that they were also questioning Jewitt, who would likely claim defendant was the thief, and told him they could only believe one person's story. They then urged him to be honest, tell the truth, and "win the contest" because they "liked" him more than Jewitt. Defendant, however, continued denying any knowledge of the theft.

Over an hour into the interview, when detectives falsely claimed they had found Knauss's body, defendant finally admitted a "jacking" had occurred. While breaking into tears, he insisted he was only a bystander and again denied knowing exactly what happened.

By the time he was assured it would all "work out," defendant had already confessed to lying in wait with Jewitt and had begun recounting some details of the abduction. Yet even after this alleged promise of leniency, he maintained that Jewitt alone was responsible for stealing the truck and killing its owner. It was only after the police persisted in questioning him about where Jewitt might have disposed of the victim's body that he finally admitted the extent of his involvement

and agreed to show them where Knauss was killed.

Defendant clearly did not react to the two comments as if he believed them to be promises, nor did they induce him to confess. *See State v. Walton,* 159 Ariz. 571, 579–80, 769 P.2d 1017, 1025–26 (1989), *aff'd on other grounds,* 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990). On the contrary, defendant's cooperation apparently was motivated more by his guilty conscience than either of the detectives' remarks. Furthermore, defendant admitted that he had not been promised anything. Having considered all of the surrounding circumstances, we cannot say that the trial court erred in finding voluntariness.

## ADEQUACY OF JURY INSTRUCTIONS

█ Defendant alleges error in the trial court's refusal to give a voluntary intoxication instruction. *See* former A.R.S. § 13–503. A party is entitled to a jury instruction on any theory reasonably supported by the evidence. *State v. LaGrand,* 152 Ariz. 483, 487, 733 P.2d 1066, 1070 (1987). In his statement, defendant said he consumed two 40–ounce bottles of malt liquor over a 1½– to 2–hour period and smoked a "hit" or two of marijuana before walking to the Tucson Mall, some 6 hours before Knauss was abducted. No other evidence of intoxication was presented.

█ "Mere proof of consumption of alcohol is insufficient for an instruction; there must be evidence that alcohol could have had an effect on defendant so as to negate an element of the crime." *State v. Murray,* 184 Ariz. 9, 34, 906 P.2d 542, 567 (1995). Defendant admitted that although the alcohol made him tired, he knew what he was doing when he committed the offenses. He was also able to recall detailed information about the crime and led police to within 100 yards of the remote desert location where the victim's body was eventually found. *See State v. Reid,* 155 Ariz. 399, 401, 747 P.2d 560, 562 (1987). A determination that defendant was intoxicated at the time of the offense would have been based on pure speculation.

█ Defendant also claims that he was entitled to a lesser-included instruction on

unlawful imprisonment even though he did not request one. He alleges that the absence of such an instruction amounts to fundamental error because the jury may have used kidnapping as the predicate offense for felony murder.

In determining if evidence is sufficient to require a lesser-included instruction, "the test is 'whether the jury could rationally fail to find the distinguishing element of the greater offense.'" *State v. Detrich*, 178 Ariz. 380, 383, 873 P.2d 1302, 1305 (1994) (citation omitted). In this case, the crucial inquiry is whether the unlawful imprisonment was accompanied by one of the enumerated mental states in the kidnapping statute, including intent to "inflict death, physical injury or a sexual offense on the victim, or to otherwise aid in the commission of a felony." A.R.S. § 13–1304(A)(3); *see Detrich*, 178 Ariz. at 383, 873 P.2d at 1305. Defendant admitted knowing or strongly suspecting that Jewitt planned to kidnap and murder the truck's owner, and he alone bound her hands and feet. There was also ample evidence of his intent to aid in stealing the truck. The court's failure to provide a lesser-included instruction on unlawful imprisonment was not error, let alone fundamental error.

■ Finally, defendant argues that he was entitled to an instruction on premeditated murder and its lesser-included offenses, even though that allegation was abandoned during trial. In *State v. West*, 176 Ariz. 432, 862 P.2d 192 (1993), we held that the trial court has "no obligation to instruct the jury on theories withdrawn in the prosecutor's discretion." *Id.* at 443, 862 P.2d at 201. Defendant's attempt to distinguish *West* is based on a misreading of the facts in that case. We find no error.

## PROSECUTORIAL MISCONDUCT

■ Defendant alleges multiple instances of prosecutorial misconduct that he contends deprived him of a fair trial. These include calling him a coward, liar, pervert, rapist, and murderer in opening statement, and, in closing argument, commenting on his failure to call an expert witness, the loss of the victim to her family, and his right to remain silent. Defendant waived all of these claims by failing to object at trial. *State v. Valdez*, 160 Ariz. 9, 13, 770 P.2d 313, 317 (1989). In any event, none requires reversal.

"Opening statement is not a time to argue the inferences and conclusions that may be drawn from evidence not yet admitted." *Bible*, 175 Ariz. at 602, 858 P.2d at 1205 (citation omitted). The prosecutor's inflammatory characterizations of defendant were plainly improper. The substantial evidence of guilt, however, combined with his acquittal of sexual assault, belies any claim that the misconduct deprived defendant of a fair trial. *See id.*

■ Comments that are invited and prompted by opposing counsel's arguments are not improper if they are reasonable and pertinent to the issues raised. *State v. Arredondo*, 111 Ariz. 141, 144, 526 P.2d 163, 166 (1974). Our review of the record indicates that the references to the victim's family and to defendant's failure to call an expert witness fall squarely into this category. Therefore, neither was inappropriate.

■ The final alleged instance of misconduct occurred during the state's rebuttal to defense counsel's intimation that detectives, through questionable interrogation techniques, put words in defendant's mouth. The prosecutor argued that only two individuals knew detailed information of the crime: "One is Jack Jewitt and the other one is sitting right here at the table asking you not to hold him accountable through his lawyer." Although this statement constitutes an impermissible comment on defendant's failure to testify, we cannot say it contributed to the jury's verdict in view of the overwhelming evidence of guilt and the context within which it was made. Any error was harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18, 23–24, 87 S.Ct. 824, 827–28, 17 L.Ed.2d 705 (1967); *State v. Scarborough*, 110 Ariz. 1, 5, 514 P.2d 997, 1001 (1973).

## ADMISSION OF GRUESOME PHOTOGRAPH

■ Defendant argues that a crime scene photo, depicting the victim lying face down and bound at the hands and ankles, was

improperly admitted. Relevant photographs that are neither inflammatory nor unduly prejudicial are admissible. *State v. Gulbrandson,* 184 Ariz. 46, 60, 906 P.2d 579, 593 (1995). The exhibit, which was the only full-body photograph of the victim in evidence, was relevant to corroborate defendant's detailed account of how she was murdered. Although arguably gruesome since the body had been in the desert for several days, the photo shows neither her face nor the fatal head wound. We find that its probative value outweighed any danger of unfair prejudice.

## SUFFICIENCY OF THE EVIDENCE

Defendant claims that the judge wrongly denied his motion for directed verdict on the theft, robbery, kidnapping, and first degree murder charges. We disagree. A judgment of acquittal is appropriate only when there is no "substantial evidence to warrant a conviction." Rule 20(a), Ariz. R.Crim.P. Evidence in the case, including defendant's statements and palmprints on the truck, clearly provided support for the verdict.

## SENTENCING ISSUES

In every capital case, this court must independently review the facts establishing the presence or absence of aggravating and mitigating circumstances to determine if the death penalty is appropriate. A.R.S. § 13–703.01(A).

## ENMUND/TISON

Because defendant was convicted of felony murder, we must ascertain whether he is death eligible. In *Enmund v. Florida,* 458 U.S. 782, 797, 102 S.Ct. 3368, 3376, 73 L.Ed.2d 1140 (1982), the United States Supreme Court held that a felony murder defendant could receive the death penalty only if he actually killed, attempted to kill, or intended to kill. The Court's subsequent decision in *Tison v. Arizona,* 481 U.S. 137, 157–58, 107 S.Ct. 1676, 1688, 95 L.Ed.2d 127 (1987), expanded this rule, allowing capital punishment where the defendant was a major participant in the underlying felony and acted with reckless indifference to human life.

In its special verdict, the trial court found beyond a reasonable doubt that: "1. The Defendant was the one who killed, or 2. The Defendant was not the actual killer but intended to kill, or 3. The Defendant was not the actual killer but was a major participant in acts that led up to the killing and exhibited a reckless indifference to human life." On its face, this alternative listing of *Enmund/Tison* factors appears improper; defendant consistently claimed that Jewitt shot the victim and there is no evidence in this record to indicate otherwise. Although generic language should be avoided in a special verdict, we have previously held that it is the substance of the finding, not its label, that counts. *State v. Runningeagle,* 176 Ariz. 59, 64, 859 P.2d 169, 174 (1993).

Here, the court went on to make specific factual findings in support of its disjunctive conclusions. These included defendant's own statements that he intended to help steal the truck and knew from the beginning its owner would be killed, that he tied up the victim, that he told her to kneel prior to being shot, and that he kept her quiet in the desert when the reservation police officer stopped to investigate. These facts establish beyond a reasonable doubt that defendant was a major participant in the murder and acted with reckless indifference to human life.

## AGGRAVATION

The trial court found that the murder was committed for pecuniary gain, A.R.S. § 13–703(F)(5), and in an especially heinous, cruel or depraved manner, A.R.S. § 13–703(F)(6).

### Pecuniary Gain

The court based its (F)(5) finding on the fact that the truck was actually stolen, defendant admitted participation in the theft, and his stated purpose for the killing was to facilitate stealing the truck and eliminate the victim as a witness. Defendant argues that the state failed to prove beyond a reasonable doubt that he, rather than Jewitt, wanted to steal the truck or kill Knauss. We disagree.

The (F)(5) aggravating factor may be established by a showing that the defendant's participation in the crime was motivated by

the expectation of pecuniary gain. *State v. LaGrand,* 153 Ariz. 21, 35, 734 P.2d 563, 577 (1987). "When a defendant *comes to rob,* [he] *expects* pecuniary gain and this desire infects *all other conduct* of the defendant." *Id.* (emphasis added); *see also State v. Greenway,* 170 Ariz. 155, 164, 823 P.2d 22, 31 (1991). Thus, a significant consideration is whether the killing was part of an overall robbery scheme, as opposed to being unexpected or accidental. *Greenway,* 170 Ariz. at 164, 823 P.2d at 31.

■ Defendant admitted that he and Jewitt, armed with a shotgun, went to a shopping mall for the sole purpose of stealing a truck. In fact, they picked out a vehicle and waited hours for the opportunity to rob its owner. Defendant acknowledged that the victim was killed to delay reporting of the theft and to eliminate the only witness, an act benefitting both perpetrators. Moreover, Jewitt announced that they would kill her execution style so "it will look like *we* didn't do it." Clearly, the murder was not accidental or unexpected but instead directly connected to the professed goal of "jacking" a vehicle. *See State v. Correll,* 148 Ariz. 468, 479, 715 P.2d 721, 732 (1986) (finding pecuniary gain where the only motivation for murders was to ensure no witnesses to robbery). That Jewitt ultimately kept the truck for himself does not nullify defendant's participation in the theft. We therefore agree with the trial court that the murder was committed for pecuniary gain.

Defendant also argues that the pecuniary gain aggravating factor is unconstitutionally overbroad because it duplicates an element of felony murder (robbery). We have previously held to the contrary, *see Greenway,* 170 Ariz. at 163–64, 823 P.2d at 30–31, and decline to revisit this issue.

### Especially Heinous, Cruel or Depraved

■ The court found the killing to be especially cruel because the drive into the desert took at least 30 minutes, the victim did not know the defendants, she was confronted with a shotgun at the beginning of the abduction, and threatened with it until her death. She was also forced to walk into the desert, disrobe, and kneel down before being shot. Defendant argues the state failed to prove beyond a reasonable doubt that he intended or foresaw the victim's mental suffering. He also claims that the court erroneously imputed Jewitt's acts and motives to him in its sentencing analysis. We again disagree.

■ Cruelty exists if the victim consciously experienced physical or mental pain prior to death, *State v. Kiles,* 175 Ariz. 358, 371, 857 P.2d 1212, 1225 (1993), and the defendant knew or should have known that suffering would occur. *State v. Apelt,* 176 Ariz. 369, 376, 861 P.2d 654, 661 (1993). "Mental anguish includes a victim's uncertainty about her ultimate fate." *Kiles,* 175 Ariz. at 371, 857 P.2d at 1225 (citations omitted).

Unquestionably, the victim suffered extreme mental distress. According to defendant, Knauss repeatedly begged not to be hurt and was "whining and whimpering" prior to being shot. He told police, "[S]he was scared. She didn't know what was gonna go on." We agree with the trial court that defendant knew or should have known that the victim would suffer mental anguish. *See State v. Lambright,* 138 Ariz. 63, 75, 673 P.2d 1, 13 (1983) (finding mental suffering where victim was abducted, sexually assaulted, and in fear for her life as shown by her trembling and begging to be released).

■ The trial court also found that the murder was committed in an especially heinous or depraved manner because the killing was senseless and the victim was helpless. *See State v. Gretzler,* 135 Ariz. 42, 52, 659 P.2d 1, 11 (1983). Ordinarily, senselessness and helplessness alone are insufficient to establish heinousness or depravity. *State v. Ross,* 180 Ariz. 598, 607, 886 P.2d 1354, 1363 (1994). Nonetheless, because we concur in the court's cruelty finding, we uphold the (F)(6) aggravating factor. *See State v. West,* 176 Ariz. 432, 448, 862 P.2d 192, 208 (1993) ("[A] finding of any one of the three factors [heinous, cruel or depraved] will suffice. . . .").

## MITIGATION

### Mental Impairment

The trial court found that defendant's "capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law" was not significantly impaired. *See* A.R.S. § 13–703(G)(1). It based this conclusion on, among other things, the fact that defendant said he knew what he did was wrong. Defendant argues, however, that he provided sufficient mitigation evidence to show that even though he could appreciate the wrongfulness of his conduct, his ability to conduct himself according to the law's requirements was impaired at the time of the offense. *See State v. Rossi*, 154 Ariz. 245, 251, 741 P.2d 1223, 1229 (1987)("[A.R.S. § 13–703(G)(1)] is phrased disjunctively.... Proof of significant impairment of either of these two personal attributes will suffice."). In support, he points to the uncontradicted testimony of Dr. Joseph Geffen, who stated that defendant's traumatic upbringing and resulting mental disturbance influenced his criminal actions.

Defendant's abusive childhood is well documented. The first incident reported to Child Protective Services (CPS) occurred when he was only 2–3 months old and was discovered sleeping in his own vomit, wearing a soiled diaper. His drug-abusing mother, who had separated from his father when defendant was very young, was investigated by CPS for physical abuse and neglect on numerous occasions throughout his developmental years.

Defendant spent a considerable amount of time at the home of his mother's parents. His grandmother beat him regularly and once severely burned him with hot water for wetting his pants. His grandfather was convicted of sexually molesting him over a substantial period of time beginning at age 11. This man had also allegedly assaulted defendant's mother and at least one of her eight sisters when they were young. Subsequently, defendant acted out in sexually inappropriate ways with other children and was placed by juvenile authorities in a residential treatment and educational program (Pathways) when he was 14 years old.

Psychological evaluations of defendant prior to and during his stay at Pathways warned of escalating developmental problems. He was diagnosed as being severely emotionally handicapped and at high risk of developing antisocial behavioral patterns. While at the group home, doctors described defendant as struggling with gender identity issues, due in part to his effeminate manner and confusion regarding sexual orientation.

Without question, defendant's years at Pathways were the most stable in his life. Although he had made considerable progress and was released prior to his 18th birthday, his case manager stated at that time, "He will need a good deal of aftercare support.... If David should fail to get the support he needs, there is a significant chance that he could cycle into the same behaviors that initially required that he be placed." However, he received little follow-up treatment after being released.

While incarcerated pending trial on the present matter, defendant was temporarily transferred into the detention center's mental health unit. Records described him as assaultive and depressed, and he was initially placed on a five-minute suicide watch. He was also treated for a contusion on his forehead apparently caused by self-inflicted head banging. He was characterized as "acutely agitated" and required the use of leather restraints. Other record entries indicated that defendant had been crying, appeared psychotic, and was disoriented as to time and place.

Dr. Geffen, one of the psychologists who had previously evaluated defendant as a juvenile, was the only mental health expert to testify at the aggravation/mitigation hearing. After meeting with defendant on four different occasions between December 27, 1993, and February 21, 1994, Dr. Geffen reported:

> Based on the obtained history, the client was considered to have been suffering from *chronic mental illness,* including a conduct disorder, severe polysubstance abuse disorder and mixed personality disorder with schizotypic, narcissistic, dependent and borderline features....

> David was considered to have demonstrated *extreme social dysfunction and an inability to function independently in the*

*general community.* He was probably not ready to be reintegrated in society after his release from the residential program. This was confirmed by the subsequent events, including his dramatic and extreme involvement in substance abuse.

....

David's history, from the time of the sexual and physical abuse experienced in his childhood, demonstrated clearly an absence of any stabilizing factors in his family life. His own experience as a victim of abuse significantly predisposed him to repeat such behaviors as he developed further, and indeed this led him to violations which brought him under the jurisdiction of the Juvenile Court and his eventual placement in a residential treatment program. Indeed, the clinical notes from that program indicated how serious the child's disturbance had been and how difficult it was to treat him.

(Emphasis added). Based on these findings, the doctor concluded:

Among the longterm psychological damages were the development of David's perceptions and feelings of being alienated from others, i.e. not belonging or being accepted. His longing for nurture and acceptance and his own poor self-perception led David to fall under the influence of a peer group of similar bent, i.e. drug using, asocial and antisocial orientation. In his interpersonal relationships within this group, David was a follower, easily manipulated and pushed to do what others with stronger willpower wanted him to do in order to prove himself worthy of their acceptance. *It is my professional opinion that David's criminal actions were directly influenced by his mentally disturbed condition.* The data obtained in this evaluation strongly indicated that *this is an individual who could not have been expected to conform to the expectations and demands of society to behave in a legal and responsible manner,* given the history of his development and the circumstances in which he was when the crimes occurred. The outcome was quite predictable.

.... There was evidence that he characteristically tends to respond impulsively

and without reflection, especially in situations of considerable stress.... Ultimately, he was unable to prevent the criminal actions or from escaping the situation....

(Emphasis added).

Lay witnesses supported Dr. Geffen's conclusions. Family members testified to defendant's immaturity and eagerness to please others. His special education teacher at Pathways observed that "he seemed young.... He seemed immature but needy, emotionally needy." A maternal aunt, with whom defendant resided until almost six months before the carjacking, stated that he craved and actively sought affection and approval. She also testified that he was anxious to please his older sister, Robin, whom she viewed as a "strong influence." He began hanging around with her friends, including her 14-year-old boyfriend, Jack Jewitt.

In *State v. Richmond,* we analyzed the origin of A.R.S. § 13–454(F)(1), currently 13–703(G)(1), and concluded that the legislature intended to exclude character and personality disorders such as sociopathy from consideration under this section. 114 Ariz. 186, 197–98, 560 P.2d 41, 52–53 (1976). Following the United States Supreme Court's decision in *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), however, we recognized that even if a disorder does not rise to the level of mental disease or defect originally contemplated in (G)(1), the inquiry is not over. *State v. McMurtrey,* 136 Ariz. 93, 102, 664 P.2d 637, 646 (1983). In *McMurtrey,* we stated:

The court must consider the offered evidence further to determine whether it in some other way suggests that the defendant should be treated with leniency. For example, a defendant may offer evidence of several factors including a difficult family history in an effort to establish the mitigating circumstance in § 13–703(G)(1). The court may not refuse to consider the independent mitigating effect, if any, of the family history merely because all the factors taken together fail to establish the mitigating circumstance in § 13–703(G)(1).

*Id.*

In considering evidence of mental impairment, our primary task is to determine its

mitigating weight, if any. Understandably, some disturbances may be more significant than others. *State v. Walton,* 159 Ariz. 571, 588, 769 P.2d 1017, 1034 (1989). For instance, in *State v. Stuard,* the defendant had organic brain damage, dementia, a low IQ bordering on retarded, and a serious personality disorder at the time of the killings. 176 Ariz. 589, 610, 863 P.2d 881, 902 (1993). We found that the impairment was significant for (G)(1) purposes and considered it a substantial factor in our independent reweighing, which resulted in a reduction of the defendant's three death sentences. *Id.* at 605–10, 863 P.2d at 897–902.

 In contrast, the remorseless, sociopathic personality of the defendant in *State v. Gerlaugh* did not constitute a mitigating circumstance, statutory or otherwise. 144 Ariz. 449, 459–60, 698 P.2d 694, 704–05 (1985). In that case, the defendant had been raised in a relatively stable home environment, and there was no evidence he had been abused as a child. The defense expert was simply unable to explain why the defendant displayed violent and destructive tendencies. *Id.* at 460, 698 P.2d at 705. Clearly, these cases represent extremes on the mitigation scale. They suggest, however, that the weight to be given mental impairment should be proportional to a defendant's ability to conform or appreciate the wrongfulness of his conduct.

 The defendant here established, by a preponderance of the evidence, that he was affected in no small measure by an impaired ability to conform his conduct to the law's requirements. The state failed to present anything to rebut Dr. Geffen's assessment, and it clearly appears that his testimony was credible. The trial court, therefore, should have given serious consideration to this evidence, either as statutory or nonstatutory mitigation. *State v. Zaragoza,* 135 Ariz. 63, 70, 659 P.2d 22, 29 (1983). We certainly do so as part of our independent review.

### Duress

 To prove he was "under unusual and substantial duress," A.R.S. § 13–703(G)(2), defendant must show that he was coerced or induced to commit the offense against his own free will. *State v. Castane-*da, 150 Ariz. 382, 394, 724 P.2d 1, 13 (1986). Although he expressed a general fear of being attacked if he did not go along with his friends, there is no evidence that Jewitt or anyone else forced defendant to participate in the crime. The trial court correctly declined to find duress as a statutory or nonstatutory circumstance.

### Minor Participant

 As previously discussed regarding the *Enmund/Tison* finding, although there is no proof defendant shot the victim, the evidence conclusively shows that he was a major participant in the murder. Thus, defendant's claim that his role was minor compared to Jewitt's fails to qualify under A.R.S. § 13–703(G)(3) or as nonstatutory mitigation.

### Foreseeability of Death

The record establishes that defendant knew the truck's owner would likely be killed. Therefore, the court properly refused to consider his claim that the death was unforeseeable as either a statutory or nonstatutory mitigating circumstance. *See* A.R.S. § 13–703(G)(4).

### Age

 Defendant was 20 years old at the time of the offense. The trial court found, and we agree, that his age is a mitigating circumstance. We also consider the defendant's intelligence, maturity, and life experiences when determining the weight to be given this factor. *State v. Gallegos,* 185 Ariz. 340, 346, 916 P.2d 1056, 1062 (1996). Although defendant's IQ at the time of the offense was in the average range, other evidence established that he was immature and easily influenced. Dr. Geffen concluded that he was "a follower, easily manipulated and pushed to do what others with stronger willpower wanted him to do." Moreover, Dr. Geffen reported that defendant's emotional development was at a child-like level and that he "never has had the experience of living as an independent functioning adult."

### Other Mitigation

The trial court considered defendant's cooperation with police and dysfunctional family background, including past drug and alcohol abuse, as nonstatutory mitigating circumstances. The state does not contest, and we agree, that they were proven by a preponderance of the evidence. We note, however, that although defendant's statements assisted in solving this homicide, his cooperation carries reduced mitigating weight in light of his initial refusal to tell the truth. *See State v. Bishop,* 127 Ariz. 531, 534–35, 622 P.2d 478, 481–82 (1980).

The court also found that defendant adequately demonstrated good conduct during trial and loving family relationships, but ruled that each was irrelevant as mitigation. In dismissing defendant's trial behavior, the judge correctly observed that such conduct "is the norm and is expected." *See State v. Spencer,* 176 Ariz. 36, 44, 859 P.2d 146, 154 (1993) (good trial behavior says nothing about defendant's character, tendencies, or rehabilitative potential). Regarding familial relationships, however, the state admits that this evidence might have some mitigating force. *Bible,* 175 Ariz. at 606, 858 P.2d at 1209. The court should have given this circumstance some weight.

Defendant next argues that the court erred by not considering the following nonstatutory mitigators: (1) ability to function well in a structured environment; (2) lack of a prior violent felony conviction; and (3) remorse. The state does not deny that the record contains evidence in support of these factors. Furthermore, each is relevant for mitigation purposes. *See State v. Murray,* 184 Ariz. 9, 40, 906 P.2d 542, 573 (1995) (potential for rehabilitation); *State v. Atwood,* 171 Ariz. 576, 654, 832 P.2d 593, 671 (1992) (lack of prior violent convictions); *State v. Tittle,* 147 Ariz. 339, 344, 710 P.2d 449, 454 (1985) (remorse).

Defendant's 2½–year stay in a residential treatment center was documented in the presentence report. Evaluations during that time indicated that he responded well in a stable and supportive environment. In addition, nothing in his criminal record reveals a tendency toward the kind of violent crime for which he has been convicted. He had one previous adult felony conviction for car theft (nondangerous), which occurred just two weeks before this incident, and his juvenile record consists mainly of sexual "acting out" episodes. In letters written to both the victim's family and the judge, defendant expressed remorse for the damage his "rash and unthoughtful" actions had caused.

The state acknowledges that the trial judge made no findings either accepting or rejecting this evidence as mitigating. It argues instead that the court is "not required to separately discuss, in the special verdict, each circumstance claimed to be mitigating, and each argument made by the defense." *State v. Spencer,* 176 Ariz. 36, 44, 859 P.2d 146, 154 (1993). This judge, however, specifically identified each nonstatutory mitigator he found to exist and whether it was relevant. It is, therefore, reasonable to conclude that defendant's remorse, his ability to function in a structured environment, and the lack of prior violent felony convictions might not have been considered. Nevertheless, the record before us contains sufficient evidence of these factors, and each will be taken into account in our independent reweighing. *See* A.R.S. §§ 13–703.01(B),(C).

Defendant also claims that the judge should have considered requests from the victim's family that he be sentenced to life imprisonment. We have previously held, however, that such evidence is irrelevant to either the defendant's character or the circumstances of the crime and is therefore not proper mitigation. *State v. Williams,* 183 Ariz. 368, 385, 904 P.2d 437, 454 (1995).

Lastly, defendant suggests that the trial court failed to consider sentencing him to life imprisonment without possibility of release under A.R.S. § 13–703(A). However, no evidence supports this assertion. *See Walton v. Arizona,* 497 U.S. 639, 653, 110 S.Ct. 3047, 3057, 111 L.Ed.2d 511 (1990)("Trial judges are presumed to know the law and to apply it in making their decisions."). We further decline defendant's request to treat the natural-life option as a mitigating circumstance. *See State v. Soto–Fong,* 187 Ariz. 186, 211, 928 P.2d 610, 635 (1996)("The availability of a

'real life' sentence is not, in our opinion, a mitigator . . . .").

## INDEPENDENT REWEIGHING

When the trial court errs in its aggravation or mitigation findings, remand is generally not appropriate unless the judge wrongly excluded evidence or the record does not adequately reflect all of the relevant facts. A.R.S. § 13–703.01(C). Neither situation is present here. Therefore, we must independently reweigh and determine whether the proven mitigation is sufficiently substantial to warrant leniency. A.R.S. § 13–703.01(B). In carrying out this duty, we have stated:

> The question before us is not whether the trial court properly imposed the death penalty, but whether, based upon the record before us, we believe that the death penalty should be imposed. A finding merely that the imposition of the death penalty by the trial court was "factually supported" or "justified by the evidence" is not the separate and independent judgment by this court that the death penalty warrants.

*State v. Watson,* 129 Ariz. 60, 63, 628 P.2d 943, 946 (1981).

Our task in evaluating and weighing the proffered mitigation is difficult at best. There is no scale upon which to measure what is or is not "sufficiently substantial." In this case, the state proved that Ellen Knauss suffered unimaginable terror. In deciding whether death is an appropriate sentence, however, we must look at more than just the facts of the crime. We must focus on the defendant in order to make an individualized sentencing determination as required by both the Arizona and United States Constitutions. In carrying out this responsibility, "we are sometimes called upon to reduce a death sentence to life imprisonment even in cases where the facts are aggravated and the tragedy immense." *Stuard,* 176 Ariz. at 605, 863 P.2d at 897.

As noted, defendant presented substantial mitigation evidence. Taken as a whole, this evidence causes us to question whether death is appropriate. Where "there is a doubt whether the death sentence should be imposed, we will resolve that doubt in favor of a life sentence." *State v. Valencia,* 132 Ariz. 248, 250, 645 P.2d 239, 241 (1982). Due to the danger defendant poses to society, however, we believe he should be imprisoned for the rest of his natural life and never be released.

In view of the foregoing resolution, it is unnecessary to address defendant's other sentencing issues.

## DISPOSITION

Defendant's convictions and non-capital sentences are affirmed. His sentence of death is reduced to natural life imprisonment without possibility of release, to be served consecutively to the prison terms for the non-capital convictions. *See* A.R.S. §§ 13–703.01(B), –703(A), and –708.

FELDMAN and MOELLER, JJ., concur.

JONES, Vice Chief Justice, dissenting:

I respectfully dissent. After weighing the aggravating and mitigating factors, I would affirm the death sentence. I agree with the majority that the murder was committed for pecuniary gain, A.R.S. Section 13–703(F)(5), and in an especially heinous, cruel or depraved manner. *See* A.R.S. Section 13–703(F)(6); *State v. LaGrand,* 153 Ariz. 21, 35–36, 734 P.2d 563, 577–78 (1987). The record demonstrates that the murder was not accidental, but planned, and that the defendant participated fully in the crime. *See State v. Greenway,* 170 Ariz. 155, 164–65, 823 P.2d 22, 31–32 (1991). The crime was cruel, lasting not minutes but approximately two hours from the time the victim was accosted and kidnapped in the shopping center parking lot until her violent death in the desert. For a prolonged period prior to her death, defendant knowingly and intentionally subjected her to unspeakable anguish. *See State v. Kiles,* 175 Ariz. 358, 371, 857 P.2d 1212, 1225 (1993); *State v. Apelt,* 176 Ariz. 369, 376–77, 861 P.2d 654, 661–62 (1993); *State v. Lambright,* 138 Ariz. 63, 75, 673 P.2d 1, 13 (1983).

Weighed against the claim that defendant was a mere follower, led to commit this crime by his fourteen-year-old accomplice, I am not

**24**

persuaded that mitigating factors consisting of defendant's dysfunctional family background and his emotional and mental condition should excuse his participation in any degree. *See State v. McKinney*, 185 Ariz. 567, 580, 917 P.2d 1214, 1217 (1996); *State v. King*, 180 Ariz. 268, 282, 883 P.2d 1024, 1038 (1994). Clearly, the difficulties faced in childhood and adolescence created substantial challenges for defendant. The record persuades me, however, that no meaningful link exists between his abuse as a child and a crime of this magnitude. I perceive no significant evidence to show that even though defendant could appreciate the wrongfulness of his conduct, his ability to follow the law was impaired at the time of the offense. *See* A.R.S. § 13–703(G)(1); *State v. Rossi*, 154 Ariz. 245, 251, 741 P.2d 1223, 1229 (1987). I would agree with Dr. Joseph Geffen's testimony that defendant's childhood experience impacted his behavior, but, not to the extent that he need not be held supremely accountable for his actions against the victim in this case. *See, e.g., State v. Thornton*, 187 Ariz. 325, 334, 929 P.2d 676, 685 (1996). His past did not rob him of the ability to decide whether it was unlawful to commandeer a car he did not own, and take the life of the owner after the events and in the manner described in this record. It is sufficiently clear that defendant understood the nature of his crime and could easily have prevented both the killing and the attendant aggravation. The evidence leads me to conclude that defendant does not warrant a reduction in sentence.

MARTONE, J., concurs.